## EXCLUSIVE RECORDING AGREEMENT

Agreement made and entered into as of December 4 2002, by and between Victory Records, Inc., 346 Justine Street, Suite 504, Chicago, IL 60607 ("Company") and sure: **Streetlight Manifesto** 12 Wright Ct., East Brunswick, NJ 08816 ("You").

1.   <u>EXCLUSIVE SERVICES</u>.

Company hereby engages your exclusive personal services as a recording artist in connection with the production of Records and you hereby accept such engagement and agree to exclusively render such services for Company in the Territory during the Term and all extensions and renewals thereof. (You are sometimes called "Artist" below; all references in this agreement to you and the Artist and the like shall be understood to refer to you alone.)

2.   <u>TERM</u>.

(a)   The term of this agreement (the "Term") shall commence on the date hereof and continue for an initial period (the "First Contract Period") ending on the date that is eighteen (18) months after Delivery to Company of the Recording Commitment (as hereinafter defined) for the First Contract Period. Artist grants to Company three (3) separate, consecutive and irrevocable options, each to extend the Term for further periods ("Option Periods") consecutively commencing upon the expiration of the preceding period and expiring twelve (12) months after the date Artist delivers to Company the last Album constituting Artist's Recording Commitment in that Option Period. During each Contract Period (as defined below), Artist shall record and deliver to Company a sufficient number of Masters to constitute one (1) new, studio Album. The Albums required to be recorded and delivered under this agreement are sometimes referred to as the "Recording Commitment". As used herein, the term Contract Period shall mean the First Contract Period or any Option Period of the Term, as such may be suspended or extended as provided herein. Each option shall be exercised, if at all, by notice to you at any time prior to the date the current Contract Period would otherwise expire.

(b)   Notwithstanding anything to the contrary contained in paragraph 2(a), if Company has not exercised its option to extend the Term of this agreement for an additional contract period as of the date the then-current contract period would otherwise expire, the following will apply: (i) you will notify Company (the "Option Warning") that the applicable option has not yet been exercised; (ii) Company will have the right to exercise such option at any time until the date ten (10) business days after Company's receipt of the Option Warning (the "Extension Period"); (iii) the then-current contract period will continue in effect until <u>either</u> the end of the Extension Period, <u>or</u> Company's written notice to you ("Termination Notice") that it does not wish to exercise such option, whichever is sooner, and (iv) for the avoidance of doubt, nothing herein will limit Company's right to send a Termination Notice to you at any time, nor limit Company's right to exercise an option at any time if you fail to send Company an Option Warning in accordance with paragraph 2(b)(i) above.

3.   <u>RECORDING COMMITMENT; DELIVERY</u>.

(a)   During each Contract Period you shall cause Artist to record and Deliver to Company sufficient Masters to constitute the Record specified in the following schedule (the "Recording Commitment"):

| <u>Contract Period</u> | <u>Recording Commitment</u> |
|---|---|
| First | One (1) Album (the "First Album") |

Second                          One (1) Album (the "Second Album")

Third                           One (1) Album (the "Third Album")

Fourth                          One (1) Album (the "Fourth Album")

        (b)     (i) The First Album shall be Delivered to Company within four (4) months following commencement of the First Contract Period; (ii) The Recording Commitment in respect of each Option Period shall be Delivered to Company within four (4) months following commencement of the applicable Option Period; and (iii) Unless an authorized officer of Company shall otherwise agree in writing, and without limiting any of the other provisions herein, you shall not Deliver any Album within ten (10) months following the date of the initial commercial release of the immediately preceding Album in the United States.

        (c)     The first Album to be delivered in the First Contract Period is referred to as the "First Album", and the successive Albums to be delivered in satisfaction of the Recording Commitment after the delivery of the First Album are hereafter referred to as the Second Album and the Third Album, respectively, in the order in which the same are accepted by Company hereunder. No multiple Albums shall be recorded or delivered hereunder in satisfaction of the Recording Commitment without Company's prior written consent, which may be withheld in Company's sole discretion; however, if Company consents to the delivery of a multiple Album hereunder, then such multiple Album shall be deemed a single Album.

4.     RECORDING PROCEDURE.

        (a)     Prior to the commencement of recording any Recording(s), you and Company shall mutually agree on each of the following, in order, before you proceed further: (i) selection of, and compensation for, individual producer(s) (including, without limitation any producer advance [or fee] and producer royalty, if any); (ii) selection of material, including the Compositions to be recorded; and (iii) the dates of recording and mixing and studios where recording and mixing are to take place. In addition, at least thirty (30) days prior to the date of the first recording session for the Recordings concerned, you shall submit to Company in writing a proposed budget setting forth, in itemized detail, all anticipated Recording Costs. Upon receipt of Company's written approval of such recording budget (as approved by Company, the "Approved Budget"), you shall commence such session(s).

        (b)     Upon Company's request, Artist shall re-record any selection until a Master commercially and technically satisfactory to Company has been obtained. Company may refuse to accept, and may require Artist to deliver substitute Masters for, compositions Company deems patently offensive or which, in its judgment, violates any law, violates the rights of any person, or subjects Company to material liability for any reason.

        (c)     It is of the essence of this agreement that Artist timely supply Company with all of the information Company needs in order: (i) to make payments due or required in connection with the Masters, including, without limitation a duly completed and executed Form I-9 (or such similar forms as may be prescribed by the United States Immigration and Naturalization Service or other government agency regarding citizenship, permanent residency or so-called "documented worker" status); (ii) to comply with any and all other obligations Company may have in connection with recording the Masters, and (iii)

VictoryRecordingAgmt/PK/12/9/02            2

to release Records embodying the Masters. In the event you fail to timely comply with any of the foregoing requirements, you shall reimburse Company for any resulting penalty payments, and/or Company may deduct such penalty payments from any and all monies payable under this agreement.

(d)      Your submission of Masters to Company shall constitute your representation and warranty that you have obtained all necessary licenses, approvals, consents and permissions including, without limitation, Mechanical Licenses for "first use" compositions, licenses for sampled material, etc. You shall be solely responsible for and pay any and all costs, fees, and expenses in connection with such sample licensing and authorization, and all such sums (including, without limitation, royalties and any "rollover" payments) to the extent not paid by you, shall be deducted from any and all monies payable under this agreement. Company shall have the right to approve or disapprove (in its unrestricted discretion) all terms and conditions of any such sample license prior to embodiment on any Master. Notwithstanding the foregoing, Company may elect to arrange directly for such authorization and licensing in which event, you shall nevertheless be solely responsible for and pay any and all costs, fees and expenses in connection with such sample licensing and all such sums (including, without limitation, royalties and any "rollover" payments) to the extent not paid by you, shall be deducted from any and all monies payable under this agreement.

(e)      No "live" Recording or joint Recording shall be made under this agreement without Company's prior written approval.

(f)      Nothing in this agreement shall obligate Company to continue or permit the continuation of any recording session, even if previously approved hereunder, if Company reasonably anticipates that the Recording Costs plus all other Advances attributable to the recording session shall exceed the Approved Budget or that the Recordings being produced will not be commercially satisfactory in accordance with the provisions of this agreement.

5.      <u>GRANT OF RIGHTS.</u>

(a)      All Masters, Video Masters and other Recordings embodying Artist's performances that are made during the Term and made or Delivered hereunder, together with all reproductions derived therefrom and the performances embodied thereon (but excluding musical compositions embodied therein), shall, from the inception of the recording thereof, be the property of Company in perpetuity, free from any claims whatsoever by you or Artist or any person deriving rights or interests from or through Artist. Without limiting the generality of the foregoing, Company shall have the exclusive and unlimited right to all the results and proceeds of Artist's recording services rendered during the Term, including, without limitation, the exclusive, unlimited and perpetual right throughout the Territory: (i) to manufacture, advertise, sell, lease, license, distribute or otherwise use or dispose of, in any or all fields of use by any method now or hereafter known, Records embodying Masters, or to refrain therefrom; (ii) to use and publish and to permit others to use and publish Artist's name (including any professional name currently utilized or hereafter adopted by Artist), approved photographs and likenesses, and approved biographical material concerning Artist for advertising and trade purposes in connection with the sale of Artist's Recordings and the exploitation, in accordance with the terms hereof, of all Masters and Video Masters produced during the Term. The materials approved by Artist that contain the Artist's name or likeness or photograph or biography may also be used by Company's foreign affiliates and licensees; (iii) to obtain copyrights and renewals thereof in sound Recordings and Video Masters (as distinguished from the musical compositions embodied thereon) recorded by Artist during the Term, in Company's name as owner and "employer-for-hire" of such sound recordings and Video Masters. Artist acknowledges that Artist's services hereunder are rendered as Company's employee-for-hire for the purposes of copyright ownership of

the sound Recordings and Video Masters made hereunder. If any such Recording is determined not to be a "work made for hire", it will be deemed transferred to Company by this agreement, together with all rights in it. You and Artist hereby irrevocably and unconditionally waive any and all moral and like rights (including, *droit morale*) that you and Artist have in such Recordings and in the performances embodied therein and hereby agree not to make any claim against Company or any party authorized by Company to exploit such Recordings based on such moral or like rights; (iv) to release Records derived from Masters recorded during the Term by Artist under any name, trademark or label which Company may from time to time elect; and (v) to perform such Records and to permit performances thereof by means of radio broadcast, television, internet or any other method or medium now or hereafter known or devised.

(b)     Company shall have the perpetual right, without any liability to any party, to use and to authorize others to use your name and the names (including any professional names heretofore or hereafter adopted), and any likenesses (including photographs, portraits, caricatures and stills from any Videos made hereunder) and biographical material relating to Artist and any producer of Masters hereunder, on and in the packaging of Records hereunder, for purposes of advertising, promotion and trade and in connection with the making, exploitation, promotion, marketing and publicity of Records hereunder, the writing and publishing of articles by Company or third parties, in general goodwill advertising (advertising designed to create goodwill and prestige for Company and not for the purpose of selling any specific product or service), and including, without limitation, purposes collateral to such permitted purposes (e.g., MTV's advertising and promotion), without payment of additional compensation to Artist or any other person. You warrant and represent that you own the exclusive right to so use such names, likenesses and biographical materials and that the use of same will not infringe upon the rights of any third party. If any third party challenges Artist's right to use a professional name, Company may, at its election and without limiting Company's rights, require Artist to adopt another professional name approved by Company without awaiting the determination of the validity of such challenge. During the Term, Artist will not change the name by which Artist is professionally known without Company's prior written approval.

(c)     (i)     You hereby license to Company the exclusive right throughout the Territory during the Term and the Exploitation Period (as defined below, and referred to herein as the "Website Term"), free from any claims (including, without limitation trademark infringement claims) whatsoever by you or Artist, to utilize Artist's professional name (A) in connection with the establishment or maintenance of a site or sites on the Internet having the URL _____.com or _____.com or similar designation based on or containing Artist's professional name as Company may select; provided that Company may register such URL in any and all territories and top-level domains (e.g., .com, .net, .UK, etc.) (together, the "Artist URL") and (B) in connection with a site (a "Successor Site") on each system that succeeds or is similar to the Internet (a "New System"). Without limiting the generality of the foregoing, during the Website Term, Company shall have the exclusive right to register in your favor the Artist URL, and to register similar names selected by Company in connection with any Successor Site, and to secure any and all renewals and extensions thereof on your behalf, and you hereby appoint Company as your attorney-in-fact for such purpose. You further agree that the operation and content of the sites bearing the Artist URL and any Successor Sites (together the "Artist Sites") shall be controlled by Company during the Website Term. Company shall have the exclusive right to refer to a site on the Internet or on any New System as the "official" sites relating to Artist.

(ii)     Company shall have the right to establish links to and from Company's Internet and New System sites with all other sites relating to Artist that you and/or Artist control, in which you and/or Artist have an interest or to which you have granted a third party the right to operate or administer, including fan club sites relating to Artist's merchandising and touring activities. You and Artist shall coordinate with Company

VictoryRecordingAgmt/PK/12/9/02                    4

with respect to the establishment of such links.

(iii)     After termination of the Term, you hereby grant to Company the non-exclusive, perpetual right throughout the Territory to establish one site on the Internet and/or any New System utilizing Artist's professional name in connection with Company's distribution of Recordings subject to this agreement.

(iv)     As defined herein, the term "Exploitation Period" means the period after the termination of the Term hereof and ending on the date that is three (3) months after the release of the last Single in connection with the final Album delivered by you to Company during the Term; provided that such period shall in no event extend beyond twenty-four (24) months after the termination of the Term.

6.     MARKETING RESTRICTIONS

(a)     Company agrees that it will not release any Album delivered in fulfillment of the Recording Commitment as a Budget Record in less than eighteen (18) months; as a Mid-Price Record in less than twelve (12) months after initial release of the Album in the United States. If Company releases any such Album that is a Mid-Price Record or Budget Record, as applicable, prior to the expiration of the applicable time period without your consent, your sole remedy shall be that Company shall not reduce your royalty rate pursuant to paragraph 8(i) below for sales of such Album made during such period.

(b)     Company will not give away Artist's Records to promote or as a sales incentive for Records other than Artist's.

7.     ADVANCES.

(a)     With respect to each Album required to be recorded and Delivered hereunder, Company shall pay an Advance equal to the applicable "Recording Fund" as set forth below. Each such Recording Fund is inclusive of Recording Costs for the applicable Record:

(i)     (A)     With respect to the First Album, the Recording Fund shall be Eight Thousand Five Hundred Dollars ($8500.00); and

(B)     Future advances will be based on 75% of the # of units sold on previous release upon entering studio or 18 months after release date. For example, if LP1 sells 50,000 units in its first 18 months of release the advance on LP2 would be $37,500.00.

For the purposes of making the foregoing computations, Company shall refer solely to accounting statements rendered to you through the end of the accounting period following the earlier of:  (1) the date eighteen (18) months following Company's initial release of the immediately preceding Album constituting a Recording Commitment, or (2) the earlier of the date upon which the Album for which the Recording Fund is being determined is Delivered, or the date when such Album is required to be Delivered pursuant to subparagraph 3(b) above (the "Delivery Date").  For the purposes of making said computations, reserves shall be deemed not to exceed the greater of (A) twenty five percent (25%) of Albums shipped during the applicable period, unless such returns exceed twenty five percent (25%) or (B) the number of Albums shipped during the applicable period less the number of Albums reported as sold by Soundscan during the applicable period.  In addition, for the purposes of making said computations, Company shall make a good faith estimate of so-called "pipeline" royalties earned by you hereunder in the United States, which estimate shall be based on the most current information reasonably ascertainable by Company.  As used in the immediately preceding sentence, "pipeline" shall mean royalties for sales (less returns) in the United States that have been

earned by you, but have not yet been reported by Company on accounting statements rendered to you hereunder. In no event shall any Recording Fund be less than the applicable minimum amount set forth below (the "Minimum Recording Fund") or more than the applicable maximum amount set forth below:

| Album | Minimum | Maximum |
|---|---|---|
| Second Album | $8500.00 | TBD |
| Third Album | $8500.00 | TBD |
| Fourth Album | $8500.00 | TBD |

(ii)     The foregoing sums are inclusive of all union scale payments becoming payable to Artist hereunder.

(b)     Upon receipt of invoices therefor, Company agrees to pay, as an Advance, all Recording Costs actually incurred for the production of the Masters comprising each Album constituting a Recording Commitment provided such costs have been approved by Company in writing pursuant to subparagraph 4(a). All Recording Costs incurred in excess of the applicable Authorized Budget shall be your sole responsibility, and you hereby agree to forthwith pay and discharge all such excess Recording Costs. In the event Company elects to pay any such excess Recording Costs on your behalf (which Company shall have the right, but not the obligation, to do), you shall, upon demand, reimburse Company for such excess Recording Costs or, in lieu of requesting reimbursement, Company shall have the right to deduct such excess Recording Costs from any monies payable under this agreement.

(c)     Recording Funds set forth in paragraph 7(a) above shall be payable after the deduction of all Recording Costs and other Advances paid or incurred by Company in connection with the Album concerned, promptly following the later of your delivery of such Album to Company, together with invoices for all Recording Costs incurred in connection therewith or the date on which Company determines the aggregate Recording Costs for the applicable Album, which determination Company shall in good faith endeavor to make within thirty (30) days following your delivery of such Album.

(d)     All monies paid to you or Artist, or on your or Artist's behalf, or to or on behalf of any person, firm or corporation representing you or Artist, other than royalties payable hereunder, shall constitute Advances.

8.     ROYALTIES.

Company shall credit to your royalty account royalties as described below. Royalties shall be computed by applying the applicable royalty percentage rate specified below to the applicable Royalty Base Price in respect of top-line Net Sales of the Record concerned:

(a)     (i)     The royalty rate (the "Basic U.S. Rate") in respect of Net Sales of Records (other than Audiovisual Records) consisting entirely of Masters made hereunder during the respective Contract Periods specified below and sold by Company through Normal Retail Channels in the United States ("USNRC Net Sales") shall be as follows:

| TYPE OF RECORD | CONTRACT PERIODS | BASIC U.S. RATES |
|---|---|---|
| Albums | all | 12% |
| Singles, EPs and Twelve-inch Singles | all | 8% |

(b) The Basic U.S. Rate will escalate prospectively solely in respect of USNRC Net Sales of any particular Album constituting your Recording Commitment in excess of the following number of units shall be the applicable rate set forth below rather than the otherwise applicable Basic U.S. Rate for such Album:

| RECORDING COMMITMENT | USNRC NET SALES UNITS | ESCALATED BASIC U.S. RATES |
|---|---|---|
| All Albums | 150,000 units | 13% |
| | 500,000 units | 14% |
| | 1,000,000 units | 15% |

(c) The royalty rate on Records sold for distribution through normal retail distribution channels outside of the United States shall be the following percentages of the Basic U.S. Rate, applied to the applicable Royalty Base Price, and, if sold by a licensee not owned or controlled by Company, shall be paid to Artist upon the same number of Records for which Company is paid:

| TERRITORIES | PERCENTAGE OF BASIC U.S. RATE |
|---|---|
| Canada: | 80% |
| Japan, U.K. and Europe: (excluding Yugoslavia, Poland, Serbia, Bulgaria, Romania and the Czech Republic). | 70% |
| Australasia (Australia, New Zealand) | 65% |
| Rest of the Territory | 50% |

(d) With respect to Records sold by Company through mail order or a record club or in conjunction with a television advertising campaign, and for Records sold other than through normal retail distribution channels, Artist's royalties shall be computed at fifty percent (50%) of the applicable rate as stated above. With respect to Records *licensed* by Company for sale through mail order or a record club or *licensed* by Company for sale in conjunction with a television advertising campaign, and with respect to Company's licenses of the Masters or Video Masters, Company shall credit Artist's royalty account with fifty percent (50%) of Company's Net Royalty Receipts, or fifty percent (50%) of the Net Amount Received by Company, as applicable, from such sales and licenses. No royalties shall be payable with respect to Records received by members of any Club Operation in an introductory offer in connection with joining it or as a result of the purchase of a

required number of Records including, without limitation, Records distributed as "bonus" or "free" Records, or Records for which the Club Operation is not paid.

(e) On Records sold as premium merchandise, Artist's royalties shall be computed at fifty percent (50%) of the applicable rate and the Royalty Base Price shall be the price the distributing record company receives for the premium Record.

(f) Notwithstanding any provision to the contrary herein contained and without limiting any of Company's rights hereunder, Company shall have the right to license Masters for all types of use (visual and non-visual) on a flat fee or royalty basis, in Company's discretion, for any uses referred to in this sub-paragraph, and as to any such license Company may credit to Artist's royalty account, in lieu of any other royalty, fifty percent (50%) of the Net Royalty Receipts from that license.

(g) Notwithstanding anything to the contrary contained herein, the royalty rate on any Record in a New Technology Configuration shall be seventy-five percent (75%) of the otherwise applicable royalty rate. Audio-only compact discs are not a New Technology Configuration. It is specifically acknowledged that Company's actual out-of-pocket costs incurred directly in connection with the development and production (but not the manufacturing) of Records hereunder in any New Technology Configuration shall constitute Recording Costs and are fully recoupable.

(h) With respect to Records sold directly to consumers by Company in the United States or by a Principal Licensee outside the United States, other than by the methods described in subparagraph 8(d) (e.g., without limitation, telephone, satellite, cable, direct transmission over wire or through the air, and on-line computer sales) (collectively, "Direct Transmissions"), the royalty rate shall be seventy-five percent (75%) of the royalty rate that would otherwise apply if the Record concerned was sold through Normal Retail Channels. Such royalties shall be computed on the basis of eighty-five percent (85%) of Net Sales of such Records. With respect to Records *licensed* by Company for sale directly to consumers by means of a Direct Transmission, Company shall credit Artist's royalty account with fifty percent (50%) of Company's Net Royalty Receipts, or fifty percent (50%) of the Net Amount Received by Company, as applicable, from such licenses.

(i) The royalty rate on a Budget Record or on any Record sold to the United States government, its subdivisions, departments or agencies, through military exchange channels, or to educational institutions or libraries shall be fifty percent (50%) of the applicable royalty rate set forth above; on a Mid-Price Record, seventy-five percent (75%) of the applicable royalty rate set forth above.

(j) No royalties shall be payable to Artist in respect of Records sold or distributed for promotional purposes; as surplus, overstock or scrap; as cutouts after the listing of such Records has been deleted from the catalog; as "free" or "no charge" or "bonus" Records other than Albums; for Records distributed to radio stations; or for Records distributed for use on transportation carriers or for use in juke boxes. As to Records sold at a discount to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with Company, in lieu of the Records given away or furnished on a "no-charge" basis as provided above, the applicable royalty rate otherwise payable hereunder with respect to such Records shall be reduced in the proportion that said discount wholesale price bears to the usual stated wholesale price.

(k) If any Master is recorded by Artist jointly with another artist or musician to whom Company is obligated to pay a royalty for the Master, Artist's applicable royalty rate therefor shall be divided by the number of persons (including Artist) to whom Company is obligated to pay a royalty in respect of the Master. For purposes of the immediately preceding sentence, a group of artists to whom Company is obligated to pay one "all-in" royalty shall constitute one person.

(l) The royalties provided for in this agreement are inclusive of all royalties payable to producers and all third parties (other than Mechanical Royalties) for sale of Records and use of the Masters.

(m)     As to a Record not consisting entirely of Recordings delivered hereunder, the royalty to be paid hereunder shall be prorated in the proportion the Masters (or Video Masters, as applicable) that are embodied on the Record bear to the total number of royalty-bearing master recordings (or Video Masters, as applicable) embodied on that Record.

9.     ACCOUNTING.

(a)     Statements as to royalties payable hereunder shall be sent by Company to Artist on or before the September 30th and March 31st for the respective semi-annual period ending the preceding June 30th and December 31st, together with payment of accrued royalties due to Artist, if any, on sales and licenses for which Company has received payment by the end of the semi-annual accounting period involved.  No statements need be rendered by Company for any such accounting period after the expiration of the Term for which there are no sales or other exploitations of Records derived from Masters hereunder.  Company may withhold from Artist's royalty account a reasonable reserve against anticipated returns, rebates and credits.  As initially established, such reserves shall not exceed twenty-five percent (25%) of Albums shipped during the applicable accounting period.  Should returns exceed twenty-five percent (25%) such reserve shall be raised accordingly.  With respect to sales of singles and other Record configurations, such reserves shall be held in accordance with Company's reasonable business judgment. Company will liquidate such reserves as follows: 50% of each reserve four (4) quarterly accounting periods after such reserve is established and 50% of each such reserve eight (8) quarterly accounting periods after such reserve is established. Company shall have the right to establish reserves in excess of such limitations if in Company's good faith business judgement, Company believes that the percent limitations provided herein may be insufficient to cover actual returns.

(b)     Artist shall be deemed to have consented to all royalty statements rendered by Company to Artist, and they shall not be subject to any objection by Artist for any reason, unless specific objection in writing, stating the basis thereof, is given by Artist to Company within one (1) year from the date the statement is rendered to Artist (the "Objection Period").  Any action, suit or proceeding relating to any royalty statement rendered hereunder must be commenced by Artist within one (1) year after expiration of the Objection Period for that statement.

(c)     Company shall maintain books of account concerning the sale, distribution and exploitation of Records and Masters made hereunder.  A certified public accountant on Artist's behalf may, at Artist's expense, once per calendar year, may examine Company's books as same pertain to the sale, distribution and other exploitation of Records hereunder, at Company's office, during usual business hours and upon no less than thirty (30) days prior written notice and not between November 1 and February 28 of any year. Artist shall propose to Company, in writing and accompanied by appropriate documentation, adjustments to such payments, whether positive or negative, which Artist in good faith believes to be necessary, no later than thirty (30) days after completion of the auditor's field work..  Company's books relating to activities during any accounting period may only be examined as aforesaid during the one (1) year Objection Period.

(d)     Royalties hereunder for sales and licenses derived from sources outside the United States shall be computed in the national currency in which Company is paid therefore, shall be credited to Artist's royalty account hereunder at the same rate of exchange as Company is paid or credited, and shall be proportionately subject to any foreign income, withholding, added value, transfer or comparable taxes which may be imposed upon Company's royalties for those sales and licenses.  If Company cannot collect payment in the United States in U.S. Dollars, Company shall not be required to account to you for the sale, except as provided in the next sentence.  Company shall, at your request and at your expense, deduct from the monies so blocked, and deposit in a foreign depository, the equivalent in local currency of the royalties which would be payable to you on the foreign sales concerned, to the extent such monies are available for that purpose, and only to the extent to which your royalty account is then in a fully recouped position.  All such deposits shall constitute royalty payments to you for accounting purposes.  To the extent possible, Company will

allow you to select the foreign depository referred to in this paragraph 9(d).

(e)     Company shall have the right to deduct from any amounts payable to Artist hereunder (1) such portion thereof as may be required to be deducted by any governmental authority, and (2) any amount payable by Company with respect to Artist's royalties under any union or guild agreement applicable to the Records and Masters hereunder.  Artist agrees to execute and deliver promptly to Company such forms and other documents that may be required in connection with this paragraph.

(f)     In the event Company makes any claim, or brings any action, suit or proceeding, that recovers any sums with respect to any Master, and in the event royalties are payable to Artist under this agreement from such sums received by Company, all costs and expenses of such recovery (including, without limitation, reasonable attorneys', accounting and auditing fees and expenses) shall be deducted from the gross sums so recovered.

10.     NOTICES.

Except as otherwise specifically provided herein, all notices under this agreement shall be in writing and shall be given by courier or other personal delivery, by overnight delivery by an established overnight delivery service (e.g., Federal Express, Airborne Express or United Parcel Service), or by registered or certified mail, return receipt requested, at the applicable address below, or at a substitute address designated by written notice by the party concerned,

TO YOU AT:              The address set forth on page 1; and

TO COMPANY AT:          Victory Records, Inc.
                        346 N. Justine St.
                        Suite 504
                        Chicago, IL. 60607
                        Attn:  President

                        With a Copy to:
                        Serling Rooks & Ferrara, LLP
                        254 W. 54th Street, 14th Floor
                        New York, New York 10019
                        Attn: Nicholas C. Ferrara, Esq.

Notices shall be deemed given when mailed or deposited into the custody of an overnight delivery service for overnight delivery, or, if personally delivered, when so delivered, except that a notice of change of address shall be effective only from the date of its receipt.

11.     LICENSES FOR MUSICAL COMPOSITIONS.

(a)     Artist hereby grants to Company an irrevocable license under copyright to reproduce each Controlled Composition for uses as contemplated hereunder.  Company shall pay Mechanical Royalties on Controlled Compositions at seventy-five percent (75%) of the respective minimum statutory rates (without regard to playing time) for the United States and Canada, determined at the date effective on the earlier of (i) the date such masters are delivered to Company hereunder or (ii) the date such masters are required to be delivered to Company hereunder, as applicable. Company gets usage of one track, gratis, of any royalties including mechanical for inclusion on its annual Victory Style compilation series.

(b)     There shall be an aggregate Mechanical Royalty cap of ten (10) times such rate per Album; two (2) times such rate per Single; three (3) times such rate per Twelve-inch Single; and five (5) times such per EP.  To the extent that the aggregate mechanical royalty rate would exceed the cap in any Record, the excess will be deducted from any and all monies payable

hereunder including without limitation, the Mechanical Royalties payable for the Controlled Compositions recorded under this agreement. If a Composition recorded hereunder is embodied more than once on a particular Record, Company shall pay mechanical royalties in connection therewith at the applicable rate for such Composition as though the Composition were embodied thereon only once. All Mechanical Royalties payable hereunder shall be paid on the basis of Net Sales of Records hereunder for which royalties are payable pursuant to this agreement. No mechanical royalties shall be paid on Records described in subparagraph 8(j). Company may maintain reasonable reserves with respect to payment of mechanical royalties. Notwithstanding anything to the contrary contained herein, mechanical royalties payable in respect of Controlled Compositions for sales of Records for any use described in subparagraphs 8(d), 8(e) and 8(i) shall be seventy-five percent (75%) of the otherwise applicable rate in the United States or Canada, as the case may be. Any assignment of the ownership or administration of copyright in any Controlled Composition shall be made subject to the provisions hereof and any inconsistencies between the terms of this agreement and mechanical licenses issued to and accepted by Company shall be determined by the terms of this agreement. If any Single, Maxi-Single, EP or Album contains Compositions which are not Controlled Compositions, you will obtain for Company's benefit mechanical licenses covering such Compositions on the same terms and conditions applicable to Controlled Compositions pursuant to this paragraph 11.

(c) You hereby agree that all Controlled Compositions shall be available for licensing by Company and Company's licensees, for reproduction and distribution in each country of the Territory outside of the United States and Canada through the author's society or other licensing and collecting body generally responsible for such activities in the country concerned. You shall cause the issuance of effective licenses, under copyright and otherwise, to reproduce each Controlled Composition on Records and distribute those Records outside the United States and Canada, on terms not less favorable to Company or Company's licensees than the terms prevailing on a general basis in the country concerned with respect to the use of Compositions on comparable Records.

(d) In respect of all Controlled Compositions, Company is hereby granted the irrevocable perpetual Territory wide right to reprint the lyrics on the jackets, sleeves and other packaging of Records derived from Masters hereunder. Company is hereby granted the irrevocable right throughout the Territory to recreate the title and/or lyrics to any Composition embodied in a Recording delivered hereunder in the so-called "text mode" of digital compact cassettes, interactive compact discs or any other New Technology Configuration embodying such Recording, without payment to any person or entity. If Company is required to pay any monies for the exercise of any of the rights granted to it under this subparagraph 11(d), then Company shall have the right to demand reimbursement therefore from you and Artist (and you and/or Artist shall immediately make such reimbursement) and/or the right to deduct such costs from any monies payable under this agreement.

(e) In respect of all Controlled Compositions performed in Videos, Company is hereby granted an irrevocable perpetual Territory wide license to record, synchronize and reproduce such Compositions in such Videos and to distribute and perform such Videos including, without limitation, all Audiovisual Records thereof, and to authorize others to do so. In addition, in respect of all Controlled Compositions performed in Webcasts, Company is hereby granted an irrevocable perpetual Territory wide license to record, synchronize and reproduce such Compositions in such Webcasts, and to distribute and perform such Webcasts and to authorize others to do so. Company will not be required to make any payment in connection with the uses referred to in the immediately preceding two sentences, and those licenses shall apply whether or not Company receives any payment in connection with those uses. Notwithstanding the immediately preceding sentence, following Company's full recoupment of all costs in connection with a Video, Company shall negotiate in good faith with you regarding a royalty to be paid prospectively with respect to Controlled Compositions embodied in such Video in connection with the commercial exploitation of such Video. Simultaneously with your and Company's selection of creative elements of each Video produced hereunder, you shall furnish Company with a written acknowledgment from the person(s) or entity(ies) controlling the copyright in each non-Controlled Composition to be embodied in any Video confirming the terms upon which said person(s) or entity(ies) shall issue licenses in respect thereof and in

respect of Webcasts. Upon Company's request therefor, you shall cause said person(s) or entity(ies) to forthwith issue to Company (and its designees) licenses containing said terms and such other terms and conditions as Company (or its designees) may require. Royalties in connection with licenses for the use of non-Controlled Compositions pertaining to Videos and Audiovisual Records are included in the royalties set forth in subparagraph 17 hereof. If the copyright in any Controlled Composition is owned or controlled by anyone else, you will cause that person, firm or corporation to grant Company the same rights described in this paragraph 11 on the same terms.

## 12. EVENTS OF DEFAULT.

(a) In the event Artist fails to fulfill any of Artist's recording commitments hereunder in accordance with all of the material terms and conditions of this agreement, then, in addition to any other rights or remedies available to Company, Company shall have the right, upon notice to Artist at any time prior to the expiration of the then current Contract Period (i) to terminate this agreement without further obligation to Artist as to unrecorded or unfinished Masters or Video Masters, or (ii) to extend the then current Contract Period for the duration of such default plus one hundred and fifty (150) days, with the times for the exercise by Company of its options to extend the Term and the dates of commencement of subsequent Option Periods deemed extended accordingly. Company's obligations hereunder, other than the obligation to pay earned royalties to Artist, shall be suspended for the duration of any such default. The provisions of this sub-paragraph shall not result in an extension of the Term for a period in excess of the period permitted by applicable law, if any, for the enforcement of personal service contracts.

(b) Company reserves the right, at its election, to suspend the operation of this agreement for the duration of any of the following contingencies, if, by reason of any such contingency, Company is materially hampered in the performance of its obligations under this agreement or its normal business operations are delayed or become impossible or commercially impracticable: Act of God, fire, catastrophe, labor disagreement, acts of government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting Company or the industry in which it is engaged, delays in the delivery of materials and supplies, or any other cause beyond Company's control. No suspension under this sub-paragraph shall exceed six (6) months during any Contract Period unless such contingency is industry-wide, in which event Company shall have the right to suspend the applicable Contract Period for the duration of such contingency.

(c) (i) If Company refuses without cause to allow you to fulfill your Recording Commitment for any Contract Period and if, not later than sixty (60) days after that refusal takes place, you notify Company of your desire to fulfill such Recording Commitment, then Company shall permit you to fulfill said Recording Commitment by notice to you to such effect, such notice to be given, if at all, within forty-five (45) days of Company's receipt of your notice. Should Company fail to give such notice as aforesaid, you shall have the option to terminate the Term by notice given to Company within thirty (30) days after the expiration of the forty-five (45) day period; on receipt by Company of such notice, the Term shall terminate and all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations that survive the end of the Term (e.g., warranties, Re-Recording Restrictions, rights of approval, and obligation to pay royalties), at which time Company shall pay to you, in full settlement of Company's obligations to you (other than those post-Term royalty obligations) the following applicable Advance: if the unrecorded Album is the Second Album or any subsequent Album constituting a Recording Commitment, such Advance shall be equal to ninety percent (90%) of the applicable Advance set forth in paragraph 7(a) hereof, less any sums paid by Company in connection with such unrecorded Album. If Masters sufficient to constitute at least one (1) full Album (i.e., the First Album) have not been completed, then the amount of the Advance payable to you under the preceding sentence shall be the amount equal to the minimum union scale compensation for the portion of the Recording Commitment for that Contract Period that Company refused without cause to allow you to fulfill.

(ii) Except as specifically set forth in subparagraph 12(c)(i), nothing

VictoryRecordingAgmt/PK/12/9/02                    12

herein contained shall obligate Company to make any payments to you as a result of Company's failure to permit you to record the Masters constituting the Recording Commitment. If you fail to give Company any of the notices referred to above within the periods specified therefor, Company shall be under no obligation to you for not permitting you to fulfill such Recording Commitment.

13.   INJUNCTIVE RELIEF.

Artist expressly acknowledges that Artist's services hereunder are of a special, unique and intellectual character which gives them a peculiar value, and that in the event of a breach or threatened breach by Artist of any term, condition or covenant hereof, Company shall incur immediate irreparable injury. Artist expressly agrees that Company shall be entitled to injunctive and other equitable relief, as permitted by law, to prevent a breach or threatened breach of this agreement by Artist, which relief shall be in addition to any other rights or remedies, for damages or otherwise, available to Company.

14.   COLLECTIVE BARGAINING AGREEMENTS.

During the Term, Artist warrants and represents that, if Company so requests, Artist shall become and remain a member in good standing of any labor unions with which Company may have agreements lawfully requiring such union membership, including, but not limited to, the American Federation of Musicians and the American Federation of Television and Radio Artists.

15.   WARRANTIES AND REPRESENTATIONS; INDEMNITIES.

(a)   You and Artist warrant and represent that:

(i)   Artist is over the age of eighteen (18) and neither you nor Artist is under any disability, restriction or prohibition, whether contractual or otherwise, with respect to your right to execute this agreement or your and Artist's rights to perform its terms and conditions. Without limiting the foregoing, you specifically warrant and represent that no prior obligations, contracts or agreements of any kind undertaken or entered into by Artist, will interfere in any manner with the complete performance of this agreement by Artist or with Artist's right to record any and all compositions hereunder. Artist warrants and represents that there are now in existence *no prior released or unreleased* master recordings embodying Artist's performances. You further warrant and represent that Company shall not be required to make any payments of any nature for, or in connection with, the rendition of your or Artist's services or the acquisition, exercise or exploitation of rights by Company pursuant to this agreement, except as specifically provided herein.

(ii)   You shall be solely responsible for and shall pay all monies becoming payable to Artist, each individual producer of Recordings hereunder and all other parties rendering services on or in connection with such Recordings, both in connection with such individuals' services and also the exploitation by Company and its designees of the results of such services; provided that Company shall, in accordance with all of the terms hereof, pay mechanical royalties becoming payable to the copyright proprietors of Compositions embodied on Masters and monies required to be paid to the A.F. of M. Music Performance Trust Fund and Phonograph Record Manufacturers Special Payments Fund in connection with the manufacture and sale of Records derived from Masters.

(iii)   No materials, or any use thereof, will violate any law or infringe upon or violate the rights of any third party. "Material", as used herein, includes: (i) all musical compositions and other intellectual property, embodied in the Masters, (ii) each name used by Artist in connection with the Masters, and (iii) all other ideas, other intellectual property or elements contained in or used in connection with the Masters or the packaging, sale, distribution, advertising, publicizing or other exploitation of Records embodying the Masters.

(iv)   No changes in the individuals comprising Artist will be made without

Company's prior written consent. Neither you nor Artist shall have the right, so long as this agreement is in effect, to assign Artist's professional name as mentioned on page 1 hereof or any other name(s) utilized by Artist in connection with Masters or to permit the use of said name(s) by any other individual or group of individuals without Company's prior written consent, and any attempt to do so shall be null and void and shall convey no right or title. You hereby warrant and represent that you are and shall be the sole owner of all such professional name(s), and that no other person, firm or corporation has the right to use said name(s) or to permit said name(s) to be used in connection with Records, and that you have the authority to grant Company the exclusive right to use said name(s) in the Territory in accordance with all of the terms and conditions of this agreement, and Company shall have the exclusive right to use said professional name as aforesaid.

(v)     Except as otherwise specifically set forth in this agreement, during the Term, Artist shall not perform for the purpose of making Records for anyone other than you and Company for use in the Territory and neither you nor Artist shall authorize the use of Artist's name, likeness, or other identification for the purpose of distributing, selling, advertising or exploiting Records for anyone other than you and Company in the Territory.

(vi)    Artist shall not perform any Composition recorded hereunder for anyone other than Company for use in the Territory on Records for a period of (i) five (5) years after the initial date of release of the respective Record containing such selection or (ii) two (2) years after the expiration or other termination of the Term, whichever is later ("Re-recording Restriction").

(b)     (i)     Artist agrees to and does hereby indemnify, save and hold Company harmless of and from any and all liability, loss, damage, cost or expense (including reasonable attorneys' fees) arising out of or connected with any breach, threatened breach or alleged breach of this agreement or any claim which is inconsistent with any of the warranties or representations made by you or Artist in this agreement, provided the said claim has been settled with Artist's consent, or has been reduced to judgment. Artist agrees to reimburse Company on demand for any payment made or incurred by Company with respect to any liability or claim to which the foregoing indemnity applies. Pending final determination of any claim involving such alleged breach or failure, Company may withhold sums due Artist hereunder in an amount reasonably related to the amount of such claim. If no action is filed within one (1) year following the date on which such claim was first received by Company, Company shall release all sums withheld in connection with such claim, unless Company, in its reasonable business judgment, believes an action will be filed thereafter. Notwithstanding the foregoing, if, after such release by Company of sums withheld in connection with a particular claim, such claim is reasserted, then Company's rights under this paragraph will apply *ab initio* in full force and effect. Artist shall have the right to participate in the defense of any action instituted on a claim for which Artist is responsible to indemnify Company, with counsel of Artist's choice and at Artist's expense; however, Company shall have the right at all times to maintain control of the conduct of the defense.

(ii)    Notwithstanding anything to the contrary contained herein, Company shall have the right to settle without your consent any claim involving sums of Seven Thousand Five Hundred Dollars ($7,500) or less, and this indemnity shall apply in full to any claim so settled; if you do not consent to any settlement proposed by Company for an amount in excess of Seven Thousand Five Hundred Dollars ($7,500), Company shall have the right to settle such claim without your consent, and this indemnity shall apply in full to any claim so settled, unless you post a surety bond with a surety acceptable to Company in its sole discretion. The surety bond must name Company as the beneficiary and assure prompt, unconditional payment to Company of all expenses, losses and damages (including costs and reasonable attorneys' fees) that Company may incur in connection with said claim.

16.     APPROVALS.

Whenever in this agreement Artist's approval is required, it shall not be unreasonably withheld or delayed. Artist must send written notice of approval or disapproval within five (5) days

after Artist receives Company's request for the approval. Failure to give due notice of approval or disapproval shall be deemed to be approval.

17. VIDEOS.

(a) Company shall have the right to require Artist to perform at such reasonable times and places as Company designates for the production of Video Masters featuring Artist's performances of Compositions embodied in the Masters and Artist agrees to perform to the best of Artist's ability thereon. Company shall be the exclusive owner throughout the Territory in perpetuity of such Video Masters and all rights therein, including, without limitation, all copyrights and renewal of copyrights with respect thereto, and the right to use and exploit such Video Masters in any and all forms and media. Company will consult with Artist with respect to the budget, producer, director and storyboard for each Video Master produced hereunder, but Company shall make the final decisions thereon.

(b) Company shall pay all Video production costs incurred in connection with the Videos consistent with the approved production budget. All sums paid by Company in connection with the production of the Video Masters shall constitute Advances to be charged against and recouped from Artist's royalties (excluding Mechanical Royalties) under this agreement, subject to the following sentence. One hundred percent (100%) of the aggregate amount of Video production costs shall not be recoupable from royalties payable pursuant to paragraph 8 above, but shall nevertheless be one hundred percent (100%) recoupable from Video royalties hereunder. All Video production costs in excess of the approved budget that have been incurred due to your or Artist's acts or omissions shall be your sole responsibility, and you hereby agree to forthwith pay and discharge all such excess costs. In the event that Company agrees to pay any such excess costs on your behalf, you shall, upon demand, reimburse Company for such excess costs or in lieu of requesting reimbursement, Company may deduct such excess costs from any monies otherwise due you under this agreement or any other agreement for Artist's services. In the event that Artist fails to appear at locations and/or on dates which have been mutually approved by you and Company, without reasonable excuse, the costs of cancellation of the shoot shall be fully deductible from any and all monies payable to you under this or any other agreement for Artist's services.

18. MARKETING & PUBLICITY.

(a) Company, in its sole discretion, shall have the right to expend monies in connection with (i) the independent promotion; (ii) marketing (by Company or a third party); (iii) third party publicity; and/or (iv) Co-op Advertising of any Record(s) embodying Masters subject to this agreement. Only fifty percent (50%) of any such expenditure(s) shall constitute Advances.

(b) Artist shall be available from time to time to appear for photography, poster, and cover art, and the like, under the direction of Company or its nominees and to appear for interviews with representatives of the communications media and Company's publicity personnel. Only fifty percent (50%) of the costs of Artist's travel in connection with the foregoing promotional activities shall constitute Advances.

(c) Artist shall be available from time to time at Company's request to perform for the purpose of recording for promotional purposes by means of film, videotape, or other audio-visual media performances of Compositions embodied on Masters. One hundred percent (100%) of such production and manufacturing costs shall constitute Advances.

18A. TOUR SUPPORT.

In the event Artist undertakes a personal appearance tour of Record markets in the United States in connection with an Album delivered in fulfillment of your Recording Commitment hereunder and Company has approved the details of such tour (including, without limitation, the complete intended itinerary [including the time and places of appearance] and a proposed budget that sets

forth in reasonable detail all anticipated direct expenses and revenues). One hundred percent (100%) of any and all such costs shall constitute Advances.

### 18B.  ARTWORK.

Provided neither you nor Artist is in material breach of this agreement, and subject to your reasonable availability, Company shall consult with you regarding the proposed Album cover artwork for the initial United States release during the Term of each Album constituting your Recording Commitment, provided however, Company's failure to so consult shall not be deemed to be a breach of this agreement.  One hundred percent (100%) of the costs related to the layout, design and/or artwork of Records hereunder shall constitute Advances. The type and size of packaging for any release needs to be agreed upon by both parties.

### 18C.  COMMITMENTS.

Company commits to allocating, at a minimum, the following for each album:
(a) Co-Op Advertising: $10,000.00.
(b) Consumer Advertising: $5,000.00.
(c) Street Promotions: $10,000.00.
(d) Video Budget: $2,000.00.
(e) Company will make two types of promotional posters- tour and retail, such costs are non-recoupable.
(f) If sales of Album exceed 50,000 units in it's first 12 months of release Artist will receive a non-recoupable bonus of $10,000.00.
(g) If record enters the Billboard 200 in the U.S. Company will pay Artist a one-time, non-recoupable $5,000.00 bonus.



### 20.    MERCHANDISING.

(a)      Without limiting the provisions of paragraph 5, Artist hereby grants Company during the term of this Agreement, the exclusive right, throughout the Territory, to use and authorize the use of Artist's name, likeness, logos, sobriquets and approved biographical material concerning Artist, whether alone or in conjunction with other elements, in connection with the sale, lease, license or other disposition (hereinafter collectively called "Sales") of both promotional and commercial merchandise.  It is expressly understood and agreed that any contract entered into by Company for such Sales during the Term of this agreement may, at Company's sole discretion, continue until the end of the Term.

(b)      For the rights granted by Artist to Company in this paragraph 20, Company shall credit to Artist's royalty account royalties as set forth below, and such royalties shall be accounted to you in the manner otherwise provided herein:

(i)      where Company enters into a "merch deal" with a third party, fifty percent (50%) of the gross monies received by Company in respect of such agreements.  In the event Company incurs unforeseen additional costs and expenses with respect to such merchandising sales, Artist agrees to negotiate in good faith with Company to allow Company to deduct certain costs and expenses from the aggregate of such merchandising sales.

VictoryRecordingAgmt/PK/12/9/02                    16

(ii)     where Company itself manufactures merchandise (rather than through a "merch deal" as provided in paragraph 20(b)(i) above), fifteen percent (15%) of wholesale cost of all such sales.

(c)     Company hereby grants Artist the non-exclusive right to manufacture merchandise for sale solely at live performances and on Artist's website for which Company shall not be entitled to any monies received by Artist for such sales. Such merchandise cannot be sold to third party companies without Company's prior written approval. No sales can be made by Artist to any retailer.

(d)     In regard to merchandise items manufactured by Company, Artist grants Company the right to manufacture and sell merchandise as long as the Company deems profitable. Notwithstanding the preceding sentence, Company agrees not to manufacture designs and/or items that were not for sale during the Term of the Agreement without Artist's consent.

(e)     Company shall obtain consent of Artist, not to be unreasonably withheld, with respect to all merchandise designs. Such consent shall be deemed given if Company does not receive a written objection from Artist within 10 business days after Artist's receipt of the design.

21.     <u>GROUP PROVISIONS</u>.

(a)     You warrant, represent and agree that, for so long as this agreement shall be in effect, Artist will perform together as a group (the "Group") for Company. If any individual comprising Artist refuses, neglects or fails to perform together with the other individuals comprising Artist in fulfillment of the obligations agreed to be performed under this agreement or leaves the Group, you shall give Company prompt written notice thereof. Said individual shall remain bound by this agreement, including, without limitation, the provisions of paragraph 21(b) or Company may, by notice in writing, (i) terminate the Term of this agreement with respect to such individual or (ii) terminate the Term of this agreement in its entirety without any obligation as to unrecorded or unDelivered Masters. In addition to all other applicable restrictions, the individual whose engagement is so terminated or who refuses, neglects or fails to perform with the Group or who leaves the Group may not perform for others for the purpose of recording any Composition as to which the applicable Re-Recording Restriction has not expired. Any member of the Group who so refuses, neglects or fails to perform with the Group or who leaves the Group shall not thereafter use the professional name of the Group in any commercial or artistic endeavor; said professional name shall remain for all purposes the property of you and those members of the Group who continue to perform their obligations hereunder and whose engagements are not terminated. The person, if any, engaged to replace the individual whose engagement is terminated shall be mutually agreed upon by Company and you; however, if agreement cannot be reached, Company may terminate the Term of this agreement by notice in writing. If an individual engagement is terminated by notice from Company, or by mutual consent, (A) each party shall be relieved and discharged from liability for Masters unrecorded at the time of such notice or mutual consent and (B) you will be solely responsible for and shall pay all monies required to be paid to any individual whose engagement is so terminated in connection with all Masters theretofore or thereafter Delivered under this agreement and you will hold Company harmless with respect thereto. Each person added to Artist, as a replacement or otherwise, shall become bound by the terms and conditions of this agreement and shall execute any other documents required by Company as a condition precedent to being so added. You shall notify Company promptly upon the addition of any person to Artist.

(b)     In addition to the rights provided in the preceding paragraph 21(a), Company shall have, and you hereby grant to Company, an irrevocable option for the individual and exclusive services of each of the individual(s) comprising Artist for the purpose of making Records. Said option with respect to such individual(s) may be exercised by Company giving you notice in writing within four (4) months after Company receives the notice provided for in paragraph 21 (a) to the effect that such individual(s) has refused, neglected or failed to perform with the other individuals comprising Artist or that such individual(s) has left the Group or that the Group has disbanded. In the event of

Company's exercise of such option, you and such individual(s) shall be deemed to have entered into a new and separate agreement with Company with respect to such individual(s) exclusive recording services upon all the terms and conditions of this agreement except that: (i) such individual shall, at Company's option, record and Deliver to Company four (4) demonstration recordings ("Demos") pursuant to a recording budget approved by Company therefor; (ii) within ninety (90) days following Company's receipt of said notice, but not sooner than ninety (90) days following Company's receipt of the Demos or the date of the Audition, as the case may be, Company shall have the option by written notice to increase the Recording Commitment and extend the term for option periods so that Company shall have the right under such agreement to the same number of Albums as Company then has rights or options for under this agreement, provided that Company shall have the right to request not less than three (3) Albums under such agreement; (iii) the provisions contained in paragraphs 7(a), 8(a), (b) and (e), 11(a) and (b) shall not be applicable, (iv) the Recording Fund applicable to each Album made under such agreement shall be seventy-five percent (75%) of the Recording Funds applicable to the corresponding Committed Album hereunder (i.e., the Recording Fund applicable to the first Album made under such agreement shall be seventy-five percent (75%) of the Recording Fund that was applicable to the first Album hereunder, etc.); (v) Company's royalty obligation to you in respect of Recordings by such individual(s) shall be the payment to you of the royalties computed as set forth in this agreement except that the Basic U.S. Rate in respect of Singles shall be seven percent (7%) and the Basic U.S. Rate in respect of Albums shall be ten percent (10%) with royalties for all other uses (foreign sales, clubs, licensing, etc.), reduced proportionately; (vi) Company shall be entitled to maintain a single account with respect to Recordings subject to this agreement and such agreement in respect of such individual(s); and (vii) Recordings by such individual shall not be applied in diminution of your Recording Commitment and Delivery obligations as set forth in paragraph 3 of this agreement.

## 22. DEFINITIONS.

For the purposes of this agreement, the following definitions and terms shall apply:

(a)      "Advance" - A prepayment of royalties. Company may recoup Advances from all royalties to be paid or accrued to or on behalf of Artist pursuant to this agreement. Mechanical Royalties shall not be chargeable in recoupment of any Advances except those that are expressly recoupable from "any monies" or "any and all monies" payable under this agreement.

(b)      "Album" - One (1) or more audio-only Records, at least forty-five (45) minutes in playing time and embodying at least ten (10) Masters of different compositions sold in a single package.

(c)      "Audiovisual Record" - A Record which embodies, reproduces, transmits or otherwise communicates visual images, whether or not the interaction of a consumer is possible or necessary for the visual images to be utilized or viewed.

(d)      "Budget Album or Record" - A Record which is sold by Company or its Principal Licensee(s) at a price which is below Company's or the applicable Principal Licensee's then-prevailing top-line suggested retail list price, which price is consistently applied by Company to such Records and which Records are sold by Company or its Principal Licensee(s) as budget Records.

(e)      "Container Charge"- The applicable percentages of the Base Price specified below for sales by Company:

> (i)      Analog cassette Records - twenty percent (20%); and
> (ii)     Compact disc Records and Records in all other configurations - twenty-five percent (25%).
> (iii)    Analog vinyl Records - twenty-five percent (25%).

(f)      "Controlled Composition" - a composition wholly or partly written, or directly or

indirectly owned or controlled, by Artist or a producer of Masters or by any representative of Artist or a producer hereunder.

(g)      "Co-op Advertising" - any advertising done on behalf of Artist with any retail account, including, without limitation, print ads, listening stations, endcap programs, price and positioning, sampler CDs or any other program that requires payment to a retail account.

(h)      "Delivery", "deliver" or "delivered" - The actual receipt by Company of completed, fully mixed, leadered and edited Masters comprising the applicable Recording Commitment, commercially satisfactory in Company's opinion and ready for the manufacture of Records, together with all materials, consents, approvals, licenses, and permissions Artist is required to supply to Company hereunder.

(i)      "Extended Play Record" or "EP" - An audio-only Record embodying thereon either five (5) Masters or six (6) Masters, but does not constitute an Album.

(j)      "Master" - An individual sound Recording recorded hereunder that embodies Artist's performance(s) as the featured recording artist(s).

(k)      "Mechanical Royalties" - Royalties payable to any person for the right to reproduce and distribute copyrighted compositions on Records, including, without limitation, Audiovisual Records.

(l)      "Mid-Price Album or Record" - A Record which is sold by Company or its Principal Licensee(s) at a price that is below Company's or the applicable Principal Licensee's then-prevailing top-line suggested retail list price, which price is consistently applied by Company to such Records and which Records are sold by Company or its Principal Licensee(s) as mid-priced Records.

(m)      "Multiple Record Set" - Two or more Records packaged and/or marketed as a single unit.

(n)      "Net Amount Received" - The gross, earned, non-returnable amount received by Company (excluding royalties that are based upon a percentage of a retail or wholesale or other price and excluding advances against such royalties), less any out-of-pocket costs or expenses which Company is contractually required to make to third parties, including, but not limited to, payments to a trustee or fund to the extent required by any agreement between Company and any labor organization or trustee, and less Mechanical Royalty payments. An example of a Net Amount Received is an earned payment (not an advance) under a flat fee license or flat rate license.

(o)      "Net Royalty Receipts" - Company's gross, earned royalty receipts less any out-of-pocket costs or expenses which Company is contractually required to make to third parties, and less any amounts included in the receipts that are for payments to a trustee or fund required by any agreement between Company or Artist and any labor organization or trustee, and less Mechanical Royalty payments.

(p)      "Net Sales" - Gross royalty bearing sales, less returns, credits, and reserves against anticipated returns and credits.

(q)      "New Technology Configurations" - Records in the following configurations: mini-discs, digital compact cassettes, digital audio tapes, DVD, laser discs, CD-ROM and other Records embodying, employing or otherwise utilizing any non-analog technology (whether or not presently existing or hereafter created or developed), but specifically excluding audio-only compact discs.

(r)      "Record" - Any form of reproduction, transmission or communication of Recordings, now or hereafter known, manufactured, distributed, transmitted or communicated primarily for home use, school use, juke box use or use in means of transportation, including, without

limitation, Records embodying or reproducing sound alone and Audiovisual Records.

(s)     "Recording" - Every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, or in any other form or format, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Records or for any other commercial exploitation.

(t)     "Recording Costs" - All amounts paid or incurred in connection with the production of Masters hereunder.  Recording Costs include, without limitation, all union scale payments required to be made to the Artist in connection with Masters recorded hereunder, all costs of instrumental, vocal and other personnel in connection with the recording of the Masters, travel, rehearsal, and equipment rental expenses, per diems, advances to producers, studio and engineering charges and personnel, all other amounts required to be paid pursuant to any applicable law or any collective bargaining agreement between Company and any union representing persons who render services in connection with the Masters, and all costs of mixing, remixing, mastering, re-mastering and the costs of producing metal parts along with all studio and engineering charges or other costs incurred in preparing Masters for the production of metal parts and/or final production Masters.  (Metal parts include lacquer, copper, and other equivalent masters.)

(u)     "Royalty Base Price" - The Suggested Retail List Price less all excise, sales and similar taxes and less the applicable Container Charges (waived) and less distributors discounts and rebates, if any.

(v)     Sales "through normal retail distribution channels" means sales made to retail stores, or for re-sale to retail stores, through Company's record distributors, or, outside the United States, through Company's foreign licensees, or by Company itself, to retail stores or for re-sale to retail stores.

(w)     "Single"- A vinyl, audio-only Record not more than seven (7) inches in diameter, or the equivalent in non-vinyl configurations.

(x)     "Street Team Monies" - the cost to manufacture sampler CDs, stickers, posters, flyers etc. that are distributed by Company or a third party.

(y)     "Suggested Retail List Price" or "SRLP" -

(i)     With respect to Records sold for distribution in the United States: one hundred thirty percent (130%) of Company's lowest published wholesale price in the category of sale concerned.  If the applicable wholesale price changes during an accounting period, the applicable wholesale price for the entire accounting period will be deemed to be the average lowest daily wholesale price during the period.

(ii)     With respect to Records sold for distribution outside the United States: the retail equivalent price utilized by Company's licensee in computing monies to be paid to Company for the Record concerned, provided that in any country where there is no actual or suggested retail list price, the SRLP will be deemed to be the price established by Company's licensee in conformity with the general practice of the recording industry in such country.

(iii)     With respect to Audiovisual Records: the published wholesale price for the Audiovisual Record concerned.

(iv)     With respect to premium Records and Records sold by Company itself through direct response:  the actual sales price of such Records.

(z)     "Twelve-inch Single" - An audio-only Record which contains not more than four (4) Recordings of different compositions.

(aa)    "Territory" - The Universe

(bb)    "Video Masters" - Videocassettes, Videodiscs or any other devices, now or hereafter known or developed (including, without limitation, any visual and/or audiovisual work using digital technology), that enable motion pictures and other audiovisual works that have a soundtrack substantially featuring the performances of Artist to be perceived visually, with sound, when used in combination with or as part of a piece of electronic, mechanical or other apparatus.

(cc)    "TBD" – To Be Determined.

## 23.    ASSIGNMENT.

Company shall have the right to assign this agreement in whole or in part.  Neither you nor Artist shall have the right to assign this agreement.

## 24.    MISCELLANEOUS.

(a)    This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof.  No modification, amendment, waiver, termination or discharge of this agreement shall be binding upon Artist or Company unless confirmed by a written instrument signed by an authorized person of Company and Artist.  A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.  All of Company and Artist's rights, options and remedies in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, option or right available to Company.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions of this agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, that provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of that provision or any other provisions of this agreement.  It is agreed that all accountings and royalty payments required herein, and all grants made herein, shall survive and continue beyond the expiration or earlier termination of this agreement.  No breach of this agreement by Company or Artist (except for Artist's breach of the exclusivity provisions hereof) shall be deemed material unless notice is given specifying the nature of the breach and the recipient of the notice fails to cure such breach, if any, within thirty (30) days after receipt of the notice; notwithstanding the foregoing, Artist expressly acknowledges that Company may obtain injunctive relief hereunder immediately, and Company is not required to delay for thirty (30) days or any other period.

(b)    This agreement is made in the State of Illinois and its validity, construction and performance shall be governed by the laws of the State of Illinois applicable to agreements made and to be entirely performed in Illinois, without regard to any conflicts of laws principles. The Federal and State courts in Cook County shall have exclusive jurisdiction of any dispute arising under or concerning this agreement.  Service of process pursuant to this paragraph may be made, among other methods, by delivering the same via overnight mail or mailing by certified air mail, return receipt requested, in the same manner as giving other notices under this agreement, and shall be effective upon sending the process.  Such service is deemed to have the same force and effect as personal service within the State of Illinois.

(c)    This agreement has binding legal effect, and grants certain exclusive rights to Company for Artist's services.  Artist acknowledges that Company has requested Artist to consult with and be represented by an attorney who is knowledgeable about the subject of this agreement and the record and music and entertainment industries, to be advised about the content and effect of the provisions of this agreement, and to follow Artist's attorney's advice about entering into this agreement.  You have either done so, or voluntarily not exercised your right to do so.

    (d)    This agreement shall not become effective until it is executed by all parties.

    IN WITNESS WHEREOF, the parties hereto have executed this agreement on the day and year first above written.

VICTORY RECORDS, INC.

By: _____

AGREED & ACCEPTED:

_____

Soc. Sec. No. _____

_____

Tomas Kalnoky

_____

Joshua David Ansley

_____

Jamie Patrick Egan

_____

Daniel Joseph Ross

_____

Peter Anthony Sibilia

_____

Paul Edward Lowndes