# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

| | | |
|---|---|---|
| VICTORY RECORDS, INC., | ) | Case No. 15 CV 9180 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge James B. Zagel |
| v. | ) | |
| | ) | |
| TOMAS KALNOKY, individually and | ) | |
| doing business as STREETLIGHT MANIFESTO | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

MELONI & McCAFFREY
A Professional Corporation
Robert S. Meloni (admitted *pro hac vice*)
Thomas P. McCaffrey (*pro hac vice* pending)
Justin Ratliff (*pro hac vice* pending)
3 Columbus Circle, 15th Floor
New York, New York 10019

LEVENFELD PEARLSTEIN, LLC
Christopher Heintskill (ARDC No. 6272391)
2 North LaSalle, 13th Floor
Chicago, IL 60602

*Attorneys for Plaintiff Victory Records, Inc.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

RELEVANT BACKGROUND ....................................................................................1

    A.  The Binding Individual Member Provisions – Paragraph 21(a)............................3

    B.  The Leaving Member Provision – Paragraph 21(b). ...........................................5

    C.  SLM's Performance under the 2002 Agreement,
          as amended in 2013, and the 2008 Agreement .......................................................6

    D.  Kalnoky's Individual Breaches of the 2002 Agreement.....................................7

ARGUMENT................................................................................................................10

    I.    APPLICABLE STANDARD UNDER FED. R. CIV. P. 12(b)(6).....................10

    II.   THE 2002 AGREEMENT MUST BE READ AS A WHOLE
        AND ALL ITS TERMS GIVEN THEIR PLAIN MEANING.........................12

    III. KALNOKY'S MYOPIC INTERPRETATION OF THE
        2002 AGREEMENT PRODUCES ABSURD RESULTS ................................15

    IV. KALNOKY'S LEAVING MEMBER OPTION
        ARGUMENT IS IMPROPER AND UNSUPPORTABLE................................18

CONCLUSION............................................................................................................20

**TABLE OF AUTHORITIES**

<u>*Cases*</u>                                                                                               <u>**Pages**</u>

*Alam v. Miller Brewing Co.,*
    709 F.3d 662 (7th Cir.2013) ...............................................................................11

*Appert v. Morgan Stanley Dean Witter, Inc.,*
    No. 08–CV–7130, 2010 WL 5186765 (N.D. Ill. Dec. 9, 2010) ...........................13

*Atlantic Mutual Ins. Co. v. Metron Engineering and Construction Co.,*
    83 F.3d 897 (7th Cir.1996) .................................................................................13

*Avnet, Inc. v. Motio, Inc.,*
    Case. No. 12 C 2100, 2015 WL 5307515 (N.D. Ill. Sept. 9, 2015).......................10

*Bee v. Local 719, United Auto Workers,*
    744 F. Supp. 835 (N.D. Ill. 1990) ......................................................12 n.8, 18 n.11

*Bourke v. Dun & Bradstreet Corp.,*
    159 F.3d 1032, 1038 (7th Cir. 1998) ...................................................................14

*Brown v. Northern Illinois University*,
    Case No. 15 C 50154, 2015 WL 9182797 (N.D. Ill. Dec. 17, 2015).....................10

*Chicago Title & Trust Co. v. Telco Capital Corp.,*
    292 Ill. App. 3d 553, 685 N.E.2d 952 (1997) ......................................................14

*Christie Clinic, P.C. v Multiplan, Inc.,*
    08-CV-2065, 2008 WL 4615435 (C.D. Ill Oct. 15, 2008)...................................13

*Coll. Craft Enterprises, Ltd. v Coll. Crew Painters,*
    86 C 3551, 1986 WL 12309 (N.D. Ill. Oct. 29, 1986)..................................16 n.10

*Conley v. Gibson,*
    355 U.S. 41 (1957) .............................................................................................10

*Con-Way Cent. Exp., Inc. v Fujisawa U.S.A., Inc.,*
    91 C 4335, 1992 WL 168553 (N.D. Ill July 9, 1992).........................12 n.8, 18 n.11

*Dawson v. Gen. Motors Corp.,*
    977 F.2d 369 (7th Cir.1992) ...............................................................................13

*Emergency Med. Care, Inc. v. Marion Mem'l Hosp.,*
    94 F.3d 1059 (7th Cir.1996) ...............................................................................14

*Ewing v. Tilden Commercial All., Inc.*,
95 C 544, 1995 WL 239375 (N.D. Ill. Apr. 21, 1995) ..............................10, 11, 12

*Facility Wizard Software, Inc. v. Se. Technical Servs., LLC*,
647 F.Supp.2d 938 (N.D. Ill. 2009).........................................................................13

*First Illinois Bank & Trust v. Galuska*,
255 Ill.App.3d 86, 92, 194 Ill. Dec. 209, 627 N.E.2d 325 (1993) .........................14

*Fidelity & Cas. Indem. Co., Ltd. v. Southside Ford Truck Sales, Inc.*,
No. 90 C 7124, 1992 WL 208983 (N.D. Ill. Aug. 19, 1992).................................10

*Friedel v. City of Madison*,
832 F.2d 965 (7th Cir.1987) ..............................................................12 n.8, 18 n.11

*Geinosky v. City of Chicago*,
675 F.3d 743 (7th Cir.2012) ...........................................................................11, 15

*Gibson v. City of Chicago*,
910 F.2d 1510 (7th Cir.1990) ................................................................................10

*Gillis v. Blitt & Gaines, P.C.*,
Case No. 14–cv–5782, 2015 WL 5821637 (N.D. Ill.  Oct. 1, 2015) .....................11

*Gubala v. CVS Pharmacy, Inc.*,
No. 14 C 9039, 2015 WL 3777627 (N.D. Ill. June 16, 2015) ...............................11

*Henson v. CSC Credit Services*,
29 F.3d 280 (7th Cir. 1994) ...................................................................................11

*Homeowners Choice, Inc. v. Aon Benfield, Inc.*,
10 C 7700, 2012 WL 3961345 (N.D. Ill. Sept. 10, 2012).....................................13

*Illinois Farmers Ins. Co. v. GSW, Inc.*,
04 C 1501, 2005 WL 1126552 (N.D.  Ill. Jan. 25, 2005) ......................................12

*J & J Sports Productions, Inc. v. Davies*,
15-CV-04272, 2015 WL 4978697 (N.D. Ill. Aug. 19, 2015) ...............................12

*J & J Sports Productions, Inc. v. Rezdndiz*,
08 C 4121, 2008 WL 5211288 (N.D. Ill. Dec. 9, 2008) .......................................11

*Killingsworth v. HSBC Bank Nevada, N.A.*,
507 F.3d 614 (7th Cir.2007) ...........................................................................10, 11

*Kinney v. Dominick's Finer Foods, Inc.*,
780 F. Supp. 1178 (N.D. Ill. 1991) .............................................................12, 19, 20

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.,*
    379 F. Supp. 2d 968 (N.D. Ill. 2005) ....................................................................14

*Martinez v. Trainor,*
    556 F2d 818 (7th Cir 1977) ..........................................................................15 n.9

*Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.,*
    136 F.3d 1116 (7th Cir.1998) ...............................................................................12

*Menominee Indian Tribe of Wis. v. Thompson,*
    161 F.3d 449 (7th Cir. 1998) ................................................................................11

*Moriarty ex rel. Teamsters Local Union No. 727 Health & Welfare Fund v.*
*K & M Plastics, Inc.,*
    No. 03 C 7295, 2004 WL 1170000 (N.D. Ill. Feb. 6, 2004)......................10, 14, 15

*Nathan v. Morgan Stanley Renewable Dev. Fund, LLC,*
    No. 11 C 2231, 2012 WL 1886440 (N.D. Ill. May 22, 2012) ...............................12

*Neuma, Inc. v. E.I. Du Pont De Nemours and Co.,*
    9 F. Supp. 2d 952 (N.D. Ill. 1998) .......................................................................12

*Okay Drainage Dist. v. National Distillers and Chemical Corp.,*
    882 F.2d 1241 (7th Cir.1989) ...............................................................................13

*O'Rourke v. Access Health, Inc.,*
    282 Ill. App.3d 394, 218 Ill. Dec. 51, 668 N.E.2d 214 (1996) .............................14

*Peraica v. Village of McCook,*
    Case No. 10 C 7040, 2015 WL 5090484 (N.D. Ill. Aug. 28, 2015) ........11, 16 n.10

*Pisciotta v. Old Nat'l Bancorp,*
    499 F.3d 629 (7th Cir. 2007) ................................................................................10

*Quake Constr., Inc. v. Am. Airlines, Inc.,*
    141 Ill.2d 281, 152 Ill. Dec. 308, 565 N.E.2d 990 (Ill.1990) ...............................13

*Richards v. Mitcheff,*
    696 F.3d 635 (7th Cir. 2012) ................................................................................10

*Rose v. Board of Election Commissioners for City of Chicago,*
    Case No. 15–cv–382, 2015 WL 1509812 (N.D. Ill. March 30, 2015) ...................11

*Rothner v. Chicago,*
    929 F. 2d 297 (7th Cir. 1991) ...............................................................................10

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.,*
786 F. 3d 510 (7th Cir. 2015) ........................................................ 20 n.12

*Sampson v. Marovitz,*
88 C 5697, 1988 WL 121588 (N.D. Ill. Nov. 8, 1988)
*affd*, 899 F2d 16 (7th Cir 1990) ............................................................12

*Scheduling Corp. of America v. Massello,*
119 Ill. App.3d 355, 74 Ill. Dec. 796, 456 N.E.2d 298 (1983) ..............................14

*Taylor v. Blitt & Gaines, P.C.,*
Case No. 14–cv–5781, 2015 WL 5821704 (N.D. Ill. Oct. 1, 2015) .....................10

*Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC,*
741 F.3d 819 (7th Cir.2014) ................................................................11

*Thompson v. Gordon,*
241 Ill.2d 428, 349 Ill. Dec. 936, 948 N.E.2d 39 (Ill. 2011) .................................13

*Williams v. Mercury Record Corp.,*
295 F.2d 284 (7th Cir. 1961) ................................................................17

*Yeftich v. Navistar,*
722 F.3d 911 (7th Cir. 2013) ................................................................11

*Yeksigian v. Nappi,*
900 F.2d 101 (7th Cir.1990) ................................................................10

**Statutes**

Fed. R. Civ. P. 12(b)(6)…................. 1, 10, 11, 12 & n.8, 14, 15, 16 n.10, 18, 19, 20 & n.11

Now comes Plaintiff, Victory Records, Inc. ("Plaintiff" or "Victory"), by its undersigned attorneys, to oppose Defendants' Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), and states as follows:

## PRELIMINARY STATEMENT

This case involves, *inter alia*, a talented but mercurial individual, Tomas Kalnoky, whose musical creativity is only surpassed by his ego. Kalnoky was plucked out of obscurity by plaintiff Victory Records, Inc. ("Victory") when, in late 1997, it signed Kalnoky, along with other musicians, professionally known as "Catch 22," to a recording artist deal. In or about 1999, Kalnoky left Catch 22 and formed another band with a new configuration of musicians featuring Kalnoky called "Streetlight Manifesto" ("SLM"). Victory signed SLM to a recording artist and merchandising deal in 2002 and, thereafter, made SLM a success by devoting significant resources, money, experience, passion and effort into promoting and marketing Kalnoky and the groups he organized and led. However, Kalnoky continuously and publically demonstrated a petulant antiauthoritarianism and disdain for Victory and its owner, Anthony Brummel. Victory patiently ignored Kalnoky's immaturity for a number of years until Kalnoky finally crossed the line by materially and irreversibly breaching SLM's contract with Victory Records by, among other things, exploiting and flagrantly infringing Victory's intellectual property rights in SLM's sound recordings, repudiating his album delivery obligations, and violating re-recording restrictions. This suit followed.

## RELEVANT BACKGROUND

Victory is a successful independent record label based in Chicago, Illinois. Defendant SLM is a musical group that formed in 2002 in New Brunswick, New Jersey. Defendant Kalnoky has always been and remains the business and creative leader of, and continues to

control, SLM, including its name and assets. At all relevant times, Kalnoky was and remains the primary creative force, band leader, lead singer and primary or sole songwriter for SLM. Kalnoky is the founder of SLM and is the only remaining original member of SLM that was a party to the Agreement at issue in this action. All other signatories to the Agreement have left the group. *See* December 4, 2002 Agreement (attached to Defendant's Memorandum of Law [Dkt. No. 19] ("SLM Mem."), Ex. 1, p. 22; *see also* Dkt. No. 1 (Complaint), ¶¶11-18. Indeed, on the latest amendment to the December 4, 2002 Agreement, dated February 14, 2013 ("2013 Amendment")[1], the sole party and signatory is identified as "*Tomas Kalnoky professionally known as 'Streetlight Manifesto' ('Artist')"*. *See* Dkt. No. 1, ¶21.[2] Thus, Kalnoky is, in his individual capacity, the same as SLM, and remains equally bound by the Agreement.

In 2002, Kalnoky and some other members of the Victory band, Catch 22[3], were joined by others to form SLM. On December 4, 2002, Victory, on the one hand, and Kalnoky, Joshua David Ansley, Jamie Patrick Egan, Daniel Joseph Ross, Peter Anthony Sibilia and Paul Edward Lowndes, on the other, entered into an exclusive merchandising and recording artist agreement (the "2002 Agreement"). The signature page of the 2002 Agreement states that "*the parties hereto* have executed this agreement", and then lists each of the individual members who signed as a party *in their individual capacities*. *See* SLM Mem., Ex. 1, p. 22 (emphasis added). The 2002 Agreement was amended on February 14, 2013 and was signed only by Kalnoky, who was

---

[1] Kalnoky neglected to include a copy of the 2013 Amendment with his Motion to Dismiss, even though that amendment was integrated with and made part of the 2002 Agreement.

[2] Paragraph 21 of the Complaint reads as follows: "On December 4, 2002, SLM and Victory entered into an exclusive merchandising and recording artist agreement, *which was amended on February 14, 2013* (the "2002 Agreement" attached hereto as Exhibit A). Kalnoky, Ansley, Egan, Ross, Sibilia and Lowndes signed the 2002 Agreement on behalf of SLM." (italics added). *See* Dkt. No. 1, ¶21. A copy of the 2013 Amendment is annexed to the accompanying Declaration of Anthony Brummel dated March 10, 2016.

[3] In 1998, Victory entered into a merchandising and recording artist agreement with Kalnoky and others, then professionally known as "Catch 22" (the "Catch 22 Agreement"). Catch 22's debut album entitled "Keasbey Nights" was released by Victory in 1998 (the original "Keasbey Nights Album"). *See* Dkt. No. 1, ¶19.

identified as follows: "*Tomas Kalnoky, professionally known as 'Streetlight Manifesto*'" (the "2013 Amendment").[4]

The 2002 Agreement's "recording commitment" required that SLM deliver to Victory up to four studio "Albums" – an initial studio album and options for three consecutive studio albums – during the term of the 2002 Agreement. SLM only delivered three commitment Albums, and is required, but had refused, to deliver a final commitment Album. The 2002 Agreement gave Victory ownership of sound recording copyrights in all SLM sound recordings created during the term thereof, and granted Victory an irrevocable license under copyright to reproduce each "Controlled Composition" for uses as contemplated under the [2002] Agreement.[5] Finally, it prohibited SLM and its individual members from re-recording Controlled Compositions for a defined period stated in the 2002 Agreement.

### A. The Binding Individual Member Provisions – Paragraph 21(a).

Paragraph 21(a) of the 2002 Agreement provides in relevant part:

"*If any individual comprising Artist refuses, neglects or fails to perform together with the other individuals comprising Artist in fulfillment of the obligations agreed to be performed under this agreement* or leaves the Group, you shall give Company written notice thereof. *Said individual shall remain bound by this agreement* . . . .

\* \* \* \*

"In addition to all other applicable restrictions, *the individual* whose engagement is so terminated or *who refuses, neglects or fails to perform with the Group* or who leaves the group may not perform for others for the purposes of recording any Composition as to which the applicable Re-Recording Restrictions has not yet expired.

\* \* \* \*

"*Each person added to Artist, as a replacement or otherwise, shall become bound by the terms and conditions of this agreement* . . . ."

---

[4] The 2013 Amendment dealt with amended terms relating to the SLM album *The Hands That Theive,* discussed further *infra.*

[5] A "Controlled Composition" is a musical composition written or owned by any band member. SLM Mem., Ex. 1, ¶22(f).

*See* SLM Mem., Ex. 1, ¶21(a) (italics added).

Thus, paragraph 21(a) expressly states that each individual person who becomes a member of SLM, "by replacement *or otherwise*, is bound by the terms and conditions of this Agreement." The plain meaning of that sentence is that every individual who became a member of SLM, including each of those individuals who first signed the 2002 Agreement *as individuals*, *not as SLM*, were "bound by the terms and conditions of this Agreement."

Paragraph 21(a) also provides that "[i]n addition to all other applicable restrictions", the individual SLM member "who refuses, neglects or fails to perform with the Group. . . may not perform for others for the purposes of recording any Composition as to which the applicable Re-Recording Restrictions has not yet expired."

The plain language of that provision is that any individual member of SLM who refuses, neglects or fails to perform with SLM pursuant to the 2002 Agreement, cannot record any of the SLM Compositions for others in violation of the Re-Recording Restrictions of the 2002 Agreement (¶15(a)(vi)).[6]

Finally, paragraph 21(a) provides that if any individual member of SLM "refuses, neglects or fails to perform" together with the other individuals comprising SLM in fulfillment of the Artist's obligations under the 2002 Agreement, SLM shall give Victory written notice thereof. In addition, the "individual" who refuses, neglects or fails to perform "shall remain bound by this agreement". By admittedly re-recording SLM Controlled Compositions in violation of the re-recording restrictions contained in paragraph 15(a)(vi), Kalnoky refused,

---

[6] A Re-Recording Restriction prohibits an artist from re-recording Compositions that were contained on albums released by the record label during the term of the artist agreement. The 2002 Agreement prohibited such new recordings for a period of 5 years after the release of the applicable record containing a Controlled Composition or 2 years after the expiration of the term of the recording agreement, whichever is later. This allows the label a set period of time to market and exploit the applicable recording without having a competing recording of the same song by the same artist in the marketplace. *See* SLM Mem., Ex. 1, ¶15(a)(vi).

4

neglected and failed to fulfill "the obligations agreed to be performed under this agreement", including, without limitation, the re-recording restrictions. However, paragraph 21(a) does not state that Kalnoky must first refuse, neglect or fail to perform his obligations in order for Kalnoky "[to] remain bound by this agreement." He is bound from its inception, unless and until SLM provides Victory with a paragraph 21(a) written notice of that event. Only then must Victory provide a counter-notice that Victory is invoking the leaving member provision under paragraph 21(b) of the 2002 Agreement *as to that individual leaving member*. Without a written notice by SLM under paragraph 21(a), the time for Victory to enforce the leaving member provision has not been triggered.

**B.     The Leaving Member Provision – Paragraph 21(b).**

Paragraph 21(b) provides in relevant part:

> "Company shall have and you hereby grant the Company, *an irrevocable option for the individual and exclusive services of each of the individual(s) comprising Artist for the purpose of making Records. Said option with respect to such individual(s) may be exercised by Company giving you notice in writing within four (4) months after the Company receives the notice provided for in paragraph 21(a) to the effect that such individual(s) has refused, neglected or failed to perform with the other individuals comprising Artist* or that such individual(s) has left the Group or that the Group has disbanded."

*See* SLM Mem., Ex. 1, ¶21(b) (italics added).

The plain meaning of paragraph 21(b) is that if SLM *first* sends Victory the written notice required under paragraph 21(a) that an existing member of SLM refuses, neglects or fails to perform with SLM, then Victory has the option to sign that person to a separate agreement with comparable terms to the 2002 Agreement. Until that written notice is sent, Victory is under no obligation to exercise the leaving member option. Moreover, pursuant to the terms in paragraph 21(a), that *individual* remains bound to the terms of the 2002 Agreement.

5

### C. SLM's Performance under the 2002 Agreement, as amended in 2013, and the 2008 Agreement

SLM delivered the following studio albums required under the 2002 Agreement: (1) *Everything Goes Numb* (released by Victory in 2003), (2) *Somewhere in the Between* (released by Victory in 2007) and (3) *The Hands That Thieve* (released by Victory in 2013). *Everything Goes Numb*, *Somewhere in the Between* and *The Hands That Thieve* will hereinafter be referred to as the "SLM Albums."[7] *See* Dkt. No. 1, Comp. ¶25.

Kalnoky, on behalf of SLM, and Victory entered into a separate agreement dated May 21, 2008 (the "2008 Covers Agreement") which obligated SLM to deliver an additional full-length album to Victory consisting entirely of cover songs written by others and was later entitled *99 Songs of Revolution: Vol. 1* (the "Covers Album"). *Id.* ¶33. The 2008 Covers Agreement provided, *inter alia*, that the Covers Album would not count towards or satisfy any of the Album Options in the 2002 Agreement, and that the Covers Album would be a separate and distinct Album outside of the 2002 Agreement. *Id.* ¶34. SLM delivered the Covers Album to Victory in 2010, almost two years after signing the 2008 Covers Agreement. It consisted of 11 tracks and it was released by Victory on March 16, 2010. *Id.* ¶35.

In or about 2013, SLM delivered the third studio album under the 2002 Agreement entitled *The Hands That Thieve* (hereafter the "*Victory/SLM The Hands That Thieve Album*"). *Id.* ¶40. Because of the growing animosity that Kalnoky had been demonstrating towards Victory, and his continual refusal to timely fulfill his recording commitments by holding overdue SLM

---

[7] In 2004, Kalnoky decided to re-record Catch 22's *Keasbey Nights* with his new band SLM. In 2006, SLM orally agreed to re-record the identical 14 songs from Catch 22's *Keasbey Nights Album* (the "*New Keasbey Nights Album*"). The decision was prompted by Victory's initial plan to re-release the album with additional content with the then current members of Catch 22. SLM and Victory orally agreed that the *New Keasbey Nights Album* would not count towards or satisfy any of the Album Options in the 2002 Agreement. This oral agreement was memorialized in email exchanges between Kalnoky and Victory's CEO, Anthony Brummel, on October 3 and 5, 2005. *Id.* ¶¶26, 31-32.

albums hostage in order to force Victory to provide concessions in the form of non-contractual advances, the details of the delivery and release of this album were confirmed and memorialized in the 2013 Amendment.

### D.  Kalnoky's Individual Breaches of the 2002 Agreement.

On or about November 16, 2010, unbeknownst to Victory, performing under his solo pseudonym "Toh Kay," Kalnoky, along with another "ska" punk musician, Dan Potthast (p/k/a "Dan P"), released an album entitled *You By Me, Vol. 1*.  Kalnoky recorded and contributed five of the ten sound recordings appearing on that album.  The album was released and distributed by Kalnoky's wholly-owned company, Pentimento Music.  Victory never authorized Kalnoky to release the 5 sound recordings (that Victory owned pursuant to the 2002 Agreement) through Pentimento or anyone else besides Victory.  *Id.* ¶38.  On or about November 22, 2011, unbeknownst to Victory, performing under his solo pseudonym "Toh Kay," Kalnoky released an album entitled *Streetlight Lullabies*.  *Id.* ¶37.  Kalnoky recorded and contributed to ten sound recordings appearing on that album. The album was also released and distributed by Pentimento. *Id.*  Victory never authorized Kalnoky to release the 10 sound recordings (that Victory owned pursuant to the 2002 Agreement) through Pentimento or anyone else besides Victory. *Id.*

On or about November 22, 2011, unbeknownst to Victory, performing under his solo pseudonym "Toh Kay," Kalnoky released a 7" Single vinyl record entitled, *We Will Fall Together. Id.* at ¶38.  Kalnoky recorded and contributed one of the two sound recordings appearing on that Single: *We Will Fall Together*, which had originally appeared on the Toh Kay Album *Somewhere in the Between*, featuring ten acoustic solo versions of SLM Controlled Compositions.  *Id.*; *see also "Streetlight Lullabies" album track listing at https://en.wikipedia.org/wiki/Streetlight_Lullabies.* The Single was also released and distributed

by Pentimento. *Id.* Victory never authorized Kalnoky to release that Single (that Victory owned pursuant to the 2002 Agreement) through Pentimento or otherwise. *Id.*

On or about August 12, 2014, unbeknownst to Victory, performing under his solo pseudonym "Toh Kay," Kalnoky, along with another musician, Marc Smith (p/k/a "Sycamore Smith"), released an EP record entitled *You By Me, Vol. 2*. *Id.* ¶39. Kalnoky recorded and contributed three of the six sound recordings appearing on that EP. *Id.* The EP was released and distributed by Kalnoky's wholly-owned company, Pentimento Music. *Id.* Victory never authorized Kalnoky to release those 3 sound recordings it owned pursuant to the 2002 Agreement through Pentimento Music or otherwise. *Id.* There is no mention in the Complaint as to whether SLM gave Victory written notice under paragraph 21(a) that by doing this Kalnoky had refused, neglected or failed to perform his obligations under the 2002 Agreement or had left SLM. *Id., passim.*

In or about 2013, performing under his solo pseudonym "Toh Kay," and unbeknownst to Victory, as part of a premeditated plan to sabotage sales of the *Victory/SLM The Hands That Thieve Album*, Kalnoky recorded an acoustic version of the same musical compositions contained on the *Victory/SLM The Hands That Thieve Album*, using a deceptively similar album name – "The Hand That Thieves" – and using the same artwork and track listing as the Victory/SLM Album (the "*Infringing Toh Kay Album*"). *Id.* ¶41. Victory released *Victory/SLM The Hands That Thieve Album* on April 30, 2013. *Id.* ¶42.

On the heels of the release of the *Victory/SLM The Hands That Thieve Album*, on or about April 30, 2013, Kalnoky released and attempted to sell and/or distribute, or license to others to sell and/or distribute, the *Infringing Toh Kay Album* directly and/or through various third party retail or distribution outlets, including through Kalnoky's wholly-owned company,

8

Pentimento Music and Kalnoky's affiliated online music store The Risc Store (www.riscstore.com), and Pentimento's distributor and so-called "Label Partner" Redeye Distribution, Inc., as well as through, without limitation, digital service providers such as iTunes, Amazon Music, Google Music, Rhapsody, Spotify, Rdio and Xbox Music. *Id.* ¶43. The Complaint does not allege that SLM gave Victory written notice under the Leaving Member provisions of paragraph 21(a) that Kalnoky's recording and releasing *You By Me, Vol. 1, Streetlight Lullabies, We Will Fall Together and/or Infringing Toh Kay Album,* Kalnoky had refused, neglected or failed to perform his obligations under the 2002 Agreement or had left SLM. *Id., passim*.

Victory sent Kalnoky various written notices objecting to the release of the *Infringing Toh Kay Album*, contending that such release constituted a material breach of the 2002 Agreement, including the re-recording restriction provisions thereof, and a violation of Victory's rights under the U.S. Copyright Act, as well as other notices objecting to inflammatory and/or defamatory statements published by Kalnoky concerning Victory. *Id.* ¶54.

SLM, through Kalnoky, thereafter informed Victory that it considers itself no longer bound and obligated under the 2002 Agreement. *Id.* ¶46. Up until this time, Victory had fully performed all of its obligations under the 2002 Agreement and remained ready, willing and able to continue to perform its obligations under the 2002 Agreement. *Id.* ¶47. Notwithstanding the above, there is no mention in the Complaint as to whether SLM gave Victory written notice under paragraph 21(a) that by doing this Kalnoky had refused, neglected or failed to perform his obligations under the 2002 Agreement or had left SLM. *Id. passim*.

This lawsuit followed. Kalnoky's motion is frivolous and must be rejected.

## ARGUMENT

### I. APPLICABLE STANDARD UNDER FED. R. CIV. P. 12(b)(6).

A motion to dismiss receives careful scrutiny and is not often granted. *See Conley v. Gibson*, 355 U.S. 41, 45–46 (1957); *Rothner v. Chicago*, 929 F.2d 297, 302 (7th Cir.1991); *Ewing v. Tilden Commercial All., Inc.*, 95 C 544, 1995 WL 239375, *3 (N.D. Ill. Apr. 21, 1995).

The purpose of a motion to dismiss is not to decide the merits of the case, but, instead to test the sufficiency of the complaint's allegations. *See Avnet, Inc. v. Motio, Inc.*, Case No. 12 C 2100, 2015 WL 5307515, *2 (N.D. Ill. Sept. 9, 2015) (*citing Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990)); *Brown v. Northern Illinois University*, Case No. 15 C 50154, 2015 WL 9182797, *1 (N.D. Ill. Dec. 17, 2015); *Fidelity & Cas. Indem. Co., Ltd. v. Southside Ford Truck Sales, Inc.*, No. 90 C 7124, 1992 WL 208983, *2 (N.D. Ill. Aug. 19, 1992) (Zagel, J.). "A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Defendant bears the burden of establishing the legal insufficiency of the complaint. *Moriarty ex rel. Teamsters Local Union No. 727 Health & Welfare Fund v. K & M Plastics, Inc.*, No. 03 C 7295, 2004 WL 1170000, *1 (N.D. Ill. Feb. 6, 2004) (*citing Yeksigian v. Nappi*, 900 F.2d 101, 104–05 (7th Cir.1990)).

On a Rule 12(b)(6) motion to dismiss, the court must accept as true the allegations of the complaint and draw all reasonable inferences in favor of plaintiff. *See Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir.2007); *Pisciotta v. Old Nat'lBancorp*, 499 F.3d 629, 633 (7th Cir. 2007); *Taylor v. Blitt & Gaines, P.C., Case No. 14–cv–5781, 2015 WL 5821704, *1 (N.D. Ill. Oct. 1, 2015)*

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual

10

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Yeftich v. Navistar*, 722 F.3d 911, 915 (7th Cir. 2013). *See also Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir.2014) (Court must draw reasonable inferences in non-movants favor). A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *See Gubala v. CVS Pharmacy, Inc.*, No. 14 C 9039, 2015 WL 3777627, *1 (N.D. Ill. June 16, 2015); *Gillis v. Blitt & Gaines, P.C.*, Case No. 14–cv–5782, 2015 WL 5821637, *1 (N.D. Ill. Oct. 1, 2015). In applying the plausibility standard, courts must accept the well-pleaded facts in the complaint as true. *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir.2013); *Rose v. Board of Election Commissioners for City of Chicago*, Case No. 15–cv–382, 2015 WL 1509812, * 3 (N.D. Ill. March 30, 2015). So, "heightened fact pleading of specifics" is still not required. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir.2007). *See also J & J Sports Productions, Inc. v. Rezdndiz*, 08 C 4121, 2008 WL 5211288, *1 (N.D. Ill. Dec. 9, 2008)

Because the focus of Rule 12(b)(6) motions is on the pleadings, Courts can review the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir.2012); *Henson v. CSC Credit Services*, 29 F.3d 280 (7th Cir. 1994). In addition to considering the facts set out in a complaint, courts can take "[j]udicial notice of historical documents, documents contained in the public record, and reports of administrative bodies". *Peraica v. Village of McCook*, Case No. 10 C 7040, 2015 WL 5090484, *1 (N.D. Ill. Aug. 28, 2015) (*quoting Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998)).

11

However, on a 12(b)(6) motion to dismiss, the court should not consider facts submitted by the movant that are outside the pleadings. *See Kinney v. Dominick's Finer Foods, Inc.* 780 F. Supp. 1178, 1181 (N.D. Ill. 1991) (Court held that "the introduction of additional facts in [the movant's] brief was improper in a Rule 12(b)(6) motion which is strictly a procedural device to test the sufficiency of the plaintiff's pleadings"); *J & J Sports Productions, Inc. v. Davies*, 15-CV-04272, 2015 WL 4978697, *3 (N.D. Ill. Aug. 19, 2015) (arguments that rely on facts outside the pleadings improper under Rule 12(b)(6)); *Illinois Farmers Ins. Co. v. GSW, Inc.*, 04 C 1501, 2005 WL 1126552, *1 (N.D. Ill. Jan. 25, 2005) (Court excluded facts outside of the pleadings); *Sampson v. Marovitz,* 88 C 5697, 1988 WL 121588, at *2 (N.D. Ill. Nov. 8, 1988) (facts outside the pleadings are not considered pursuant to 12(b)(6) motion) *affd,* 899 F2d 16 (7th Cir 1990); *Neuma, Inc. v. E.I. Du Pont De Nemours and Co.*, 9 F. Supp. 2d 952, 954 (N.D. Ill. 1998) (same). Indeed, the introduction of additional facts, even if relevant, is generally improper. *See Ewing v. Tilden Commercial All., Inc.*, 95 C 544, 1995 WL 239375, *3 (N.D. Ill. Apr. 21, 1995).[8]

## II.   THE 2002 AGREEMENT MUST BE READ AS A WHOLE AND ALL ITS TERMS GIVEN THEIR PLAIN MEANING.

While Rule 12(b)(6) controls the standard under which Victory must give notice of its contract claim, the elements of the claim itself are governed exclusively by state law. *Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir.1998).   Under Illinois law, when a party moves to dismiss a complaint for failure to state a claim based on contract interpretation, courts examine whether or not the clear, unambiguous language of a contract

---

[8]   Moreover, conversions of Rule 12(b)(6) motions into motions for summary judgment are inappropriate where matters outside of the pleadings are not identified by affidavit or otherwise made admissible in evidence in accordance with the requirement of Rule 56. *See Friedel v. City of Madison*, 832 F.2d 965, 969–70 (7th Cir.1987); *Con-Way Cent. Exp., Inc. v Fujisawa U.S.A., Inc.*, 91 C 4335, 1992 WL 168553, *4 (N.D. Ill July 9, 1992); *Bee v. Local 719, United Auto Workers*, 744 F. Supp. 835 (N.D. Ill. 1990).

contradicts the plaintiffs' allegations. *See, e.g., Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, No. 11 C 2231, 2012 WL 1886440, *12 (N.D. Ill. May 22, 2012); *Facility Wizard Software, Inc. v. Se. Technical Servs.*, LLC, 647 F.Supp.2d 938, 942, 946–47 (N.D. Ill. 2009). While it is true that when the clear terms of a contract conflict with the plaintiff's allegations in their complaint, the contract controls. *Appert v. Morgan Stanley Dean Witter, Inc.,* No. 08–CV–7130, 2010 WL 5186765, *1 (N.D. Ill. Dec. 9, 2010). However, unless there is such a clear and unambiguous contradiction between complaint and contract, the court should not interpret any language that is ambiguous regarding the parties' intent; interpretation of contract language is a question of fact that a court cannot properly determine on a motion to dismiss. *Dawson v. Gen. Motors Corp.,* 977 F.2d 369, 373 (7th Cir. 1992); *Christie Clinic, P.C. v Multiplan, Inc.*, 08-CV-2065, 2008 WL 4615435, *7 (C.D. Ill Oct. 15, 2008). Thus, when the language of the contract is ambiguous or unclear with respect to the plaintiff's claim, the court will not dismiss it pursuant to a motion to dismiss. *See Nathan v. Morgan Stanley*, 2012 WL 1886440 at *12 (*citing Quake Constr., Inc. v. Am. Airlines, Inc.*, 141 Ill.2d 281, 152 Ill. Dec. 308, 565 N.E.2d 990, 994 (Ill. 1990)) (noting that when a contract is unclear, the intent of the parties is a question of fact which cannot be determined on a motion to dismiss).

In order to properly make that determination, the Court must determine the meaning of a contract, which is a function of context as well as semantics. *See Okay Drainage Dist. v. National Distillers and Chemical Corp*., 882 F. 2d 1241, 1244 (7th Cir. 1989). It is a basic principle in contract interpretation that meaning should be ascribed to every term in a contract. *Atlantic Mutual Ins. Co. v. Metron Engineering and Construction Co.*, 83 F.3d 897, 900 (7th Cir.1996). *See also Thompson v. Gordon*, 241 Ill.2d 428, 349 Ill. Dec. 936, 948 N.E.2d 39, 46–47 (Ill. 2011) ("The Court's goal in construing the contract is to give effect to parties' intent; the

language of the contract, read as a whole, is the best evidence of that intent."); *Homeowners Choice, Inc. v. Aon Benfield, Inc*., 10 C 7700, 2012 WL 3961345 (N.D. Ill. Sept. 10, 2012) ("Illinois law, which requires the Court to adopt a fair and reasonable reading of the whole contract, renders the construction of 'Subject Business' a question of fact."). Thus, Illinois courts endeavor to construe contracts as a whole, giving meaning to each provision. *See Bourke v. Dun & Bradstreet Corp*., 159 F.3d 1032, 1038 (7th Cir. 1998); *Emergency Med. Care, Inc. v. Marion Mem'l Hosp*., 94 F. 3d 1059, 1061 (7th Cir. 1996).

Contractual language should be interpreted according to its plain, ordinary and popular meaning. *See O'Rourke v. Access Health, Inc.*, 282 Ill. App.3d 394, 218 Ill. Dec. 51, 57, 668 N.E.2d 214, 220 (1996). Of course, where a literal reading of even seemingly unambiguous terms will produce absurd results, at odds with the parties' intent as demonstrated by a reading of the contract as a whole, a literal interpretation will not be used. *Loeffel Steel Products, Inc. v. Delta Brands, Inc.,* 379 F. Supp. 2d 968, 981 (N.D. Ill. 2005). Courts must, whenever practicable, avoid a contractual construction which would reach an absurd result. *See Chicago Title & Trust Co. v. Telco Capital Corp.*, 292 Ill. App. 3d 553, 557-58, 685 N.E.2d 952, 955-56 (1997); *First Illinois Bank & Trust v. Galuska*, 255 Ill. App. 3d 86, 92, 194 Ill. Dec. 209, 627 N.E.2d 325 (1993); *Scheduling Corp. of America v. Massello*, 119 Ill. App.3d 355, 74 Ill. Dec. 796, 456 N.E.2d 298. (1983).

A comparison of the 2002 Agreement with the Complaint demonstrates that there are no contradictions between the terms of the 2002 Agreement and the Complaint, and that Kalnoky's remaining challenges do not withstand scrutiny. Thus, Kalnoky has not carried his burden under Rule 12(b)(6) of establishing the legal insufficiency of the Complaint. *Moriarty ex rel. Teamsters*

14

*Local Union No. 727 Health & Welfare Fund v. K & M Plastics, Inc.*, No. 03 C 7295, 2004 WL 1170000, \*1 (N.D. Ill. Feb. 6, 2004) . His motion to dismiss must be denied.

### III. KALNOKY'S MYOPIC INTERPRETATION OF THE 2002 AGREEMENT PRODUCES ABSURD RESULTS.[9]

Kalnoky ignores the explicit language in the 2013 Amendment that establishes, beyond cavil, that he is SLM for purposes of the 2002 Agreement and individually bound thereby. In the preamble and the signature line, Kalnoky is identified as the sole party as follows: "Tomas Kalnoky, professionally known as 'Streetlight Manifesto'". *See* Meloni Dec., Ex. A. As the 2013 Amendment is expressly mentioned in the Complaint as part of the document identified as the governing 2002 Agreement, it is "critical to the complaint and referred to in it" and can be considered on a Rule 12(b)(6) motion. *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012). On this unopposed basis alone, Kalnoky's motion must be denied.

However, assuming arguendo, that the 2013 Amendment did not completely resolve this issue, which it does, a review of Kalnoky's arguments demonstrate that they do not sustain his burden under Rule 12(b)(6). *See Moriarty ex rel. Teamsters Local Union No. 727 Health & Welfare Fund v. K & M Plastics, Inc.*, No. 03 C 7295, 2004 WL 1170000, \*1 (N.D. Ill. Feb. 6, 2004) (Defendant bears the burden of establishing the legal insufficiency of the complaint.)

The first stage of Kalnoky's argument rests completely upon a selective interpretation of limited sections of the 2002 Agreement, instead of properly analyzing the 2002 Agreement as a whole so as to properly give meaning to all of its provisions. Victory does not quibble with all of the provisions cited by Kalnoky that demonstrate that SLM, as a group, remains irrefutably bound to Victory under the 2002 Agreement. However, Kalnoky intentionally ignores the above

---

[9] Kalnoky is stuck with the arguments he made in his moving papers and cannot amend them in his reply brief. *See Martinez v Trainor*, 556 F2d 818, 820 (7th Cir 1977) (amendments to arguments presented in the moving papers of a 12(b)(6) motion are not allowed).

15

cited provisions from paragraph 21(a), whose plain meaning demonstrates that all of the individual members of SLM, including Kalnoky and the other signatories on the 2002 Agreement, are individually bound to its terms from the outset.

Indeed, paragraph 21(a) states expressly that "[e]ach person added to Artist, as a replacement *or otherwise*, shall become bound by the terms and conditions of this agreement". The plain meaning of the term "otherwise" is "[i]n circumstances different from those present or considered; or else". www.oxforddictionaries.com/us/definition/american_english/otherwise.[10] It is clear that Kalnoky and the other signatories to the 2002 Agreement, were "otherwise" added to the Artist, SLM, either before the Agreement was drafted but in no event later than when they each signed the 2002 Agreement, representing that they were at that time added members of SLM, which could only have occurred after the binding provisions, including this one, came into being. Thus, at the time the individual members, including Kalnoky, were "otherwise" added to SLM, which as a group was bound by the 2002 Agreement, they also became bound as individuals by the terms and conditions of the 2002 Agreement.

Moreover, in the provision where the 2002 Agreement discusses those individual members, who, like Kalnoky, refuse, neglect or fail to perform as a group under the 2002 Agreement, it specifically states that "[s]aid *individual shall remain bound by this agreement*." The determinative word in that sentence is "remain" which this Court may judicially notice means "continue to exist, especially after other similar or related people or things have ceased to exist." http://www.oxforddictionaries.com/_us/definition/american_english/remain. Thus, in order to "remain bound by this agreement", the individual members must have been bound by

---

[10] The Court can take judicial notice of the definition in the dictionary. *See e.g., Coll. Craft Enterprises, Ltd. v Coll. Crew Painters,* 86 C 3551, 1986 WL 12309, *6 n. 3 (N.D. Ill. Oct. 29, 1986). The Court can consider matters subject to judicial notice on a 12(b)(6) motion to dismiss. *See Peraica v. Village of McCook*, Case No. 10 C 7040, 2015 WL 5090484, *1 (N.D. Ill. Aug. 28, 2015)

16

the 2002 Agreement in the first place. Again the plain meaning of the 2002 Agreement trumps Kalnoky's tortured interpretation thereof. The individual members are bound from its outset, so there is no contradiction between the pleadings and the Complaint.

Indeed, if the 2013 Amendment did not render it completely inapposite (which it does), this patent distinction of specific language that binds the individual, completely undercuts Kalnoky's only legal support for his position. *Williams v. Mercury Record Corp.*, 295 F.2d 284 (7th Cir. 1961). In *Williams*, the Court resolved the ambiguity relating to the meaning of the term "Artist" by reviewing the entire agreement. There was no reference in that review of contract provisions to the kind of language appearing in paragraph 21(a) of the 2002 Agreement, which so clearly binds each individual member to the terms thereof. *See Williams, passim*. Moreover, there was no reference to a Leaving Member Provision like in paragraph 21(b), which would clearly bar Williams from leaving the Platters without being signed as an individual artist with Mercury. Finally, one of the facts the Williams court relied upon was "the use of the group name in the signature." *Id.* at 286. A review of the signature lines in the 2002 Agreement, demonstrates that there was no signature line for SLM as a group (as opposed to the signature line on that page for Victory Records, Inc. signed by Anthony Brummel), but instead each member signed on their own individual signature line, including Tomas Kalnoky. *See* SLM Mem., Ex. 1, p. 22. Finally, the 2013 Amendment defined "Artist" as only Kalnoky.

Kalnoky's leaving member argument is, in the end, a red herring. Kalnoky never "left" SLM. Indeed, he is the only member of SLM who did not leave, and thus, along with being individually bound by the plain terms of the 2002 Agreement, any references to "You" or "Artist" in the 2002 Agreement can only refer to Kalnoky. *See* Dkt. No. 1, Comp. ¶¶11-18.

17

Finally, the 2013 Amendment is by itself dispositive. At the time it was signed, Kalnoky was the only member of SLM, and signed that amendment as such: "Tomas Kalnoky, professionally known as 'Streetlight Manifesto'", thus amending the very definition of "Artist" to include only Kalnoky.

### IV. KALNOKY'S LEAVING MEMBER OPTION ARGUMENT IS IMPROPER AND UNSUPPORTABLE.

Kalnoky's lawyers concede that he performed the alleged misconduct by re-recording the SLM Controlled Compositions in a purportedly "solo" capacity. SLM Mem. p. 2. Given that Kalnoky is and remains bound by the 2002 Agreement in his individual capacity under paragraph 21(a), and as the *only* person comprising the "Artist", the Court need not even address Kalnoky's second argument based upon paragraph 21(b). However, its review demonstrates that Kalnoky is not only wrong in his legal analysis, but also that his attempt to base the argument on unsupported facts from outside the pleadings, renders it improper under Rule 12(b)(6). On that basis alone the motion must be rejected.

Kalnoky understandably does not submit any facts through a sworn declaration, which would be improper on a 12(b)(6) motion.[11] However, Kalnoky's lawyers do an end run around Rule 12(b)(6) and support his arguments by arguing facts not appearing in the pleadings or complaint in Kalnoky's moving memorandum of law.

For example, Kalnoky begins the second stage of his argument with the factual allegation that he has "never 'refuse[d], neglecte[d] or fail[ed] to perform as a member" of SLM and "at all relevant times Kalnoky has performed as a member of [SLM]". SLM Mem., p. 8. There is nothing in the Complaint or in the 2002 Agreement that factually supports that argument. It

---

[11]   However, his failure to do so renders it impossible to even request at this point that the Court convert his motion to dismiss into one for summary judgment. *See Friedel v. City of Madison*, 832 F.2d 965, 969–70 (7th Cir. 1987); *Con-Way Cent. Exp., Inc. v Fujisawa U.S.A., Inc.*, 91 C 4335, 1992 WL 168553, *4 (N.D. Ill July 9, 1992); *Bee v. Local 719, United Auto Worker*s, 744 F. Supp. 835 (N.D. Ill. 1990).

18

relies totally upon his counsel's statement of facts in Kalnoky's moving memorandum. On that ground alone, Kalnoky's motion to dismiss must be rejected. *See Kinney v. Dominick's Finer Foods, Inc.*, 780 F. Supp. 1178, 1181 (N.D. Ill. 1991) (on a 12(b)(6) motion to dismiss, the court is not to consider facts submitted by the movant that are outside the pleadings).

However, Kalnoky then goes on to argue that even if Kalnoky had 'refuse[d], neglecte[d] or fail[ed] to perform as a member" of SLM, "Victory does not allege that it exercised a written option to Kalnoky's individual services". SLM Mem., p. 8. Victory has alleged that Kalnoky is individually bound under the 2002 Agreement, and that pleading does not conflict, but is supported by the plain terms of paragraph 21(a). Kalnoky's attempt to inject the factual argument that Victory did not exercise the Leaving Member Option of the 2002 Agreement is not only improper under Rule 12(b)(6), *see Kinney v. Dominick's Finer Foods, Inc.*, 780 F. Supp. at 1181, but it is irrelevant to Victory's claim against Kalnoky in his individual capacity.

Finally, assuming, *arguendo*, that Kalnoky's refusal, neglect and failure to perform under the 2002 Agreement was alleged in the Complaint as the sole basis for Victory's acquisition of rights to Kalnoky's solo services, which it is not, a review of paragraph 21(b) demonstrates that Victory's time to exercise that option has not yet been triggered. The plain language of the 2002 Agreement clearly states that Victory's four month window to exercise the option under paragraph 21(b) is not triggered until SLM provides Victory with "prompt written notice" under paragraph 21(a) of Kalnoky's misconduct. *Compare* SLM Mem. Ex 1, ¶¶21 (a) & (b). There is nothing in the Complaint or the 2002 Agreement that addresses whether Victory received the "prompt written notice" under paragraph 21(a) and whether its corresponding four month window to exercise the option has been triggered. *See* Dkt. No. 1, passim. Thus, Kalnoky's factual arguments in his moving brief purporting to allege that Victory has not exercised its

19

option under paragraph 21(b) cannot provide a basis for his Rule 12(b)(6) motion to dismiss. *See*

*Kinney v. Dominick's Finer Foods*, Inc., 780 F. Supp. at 1181.[12]

## CONCLUSION

WHEREFORE, Plaintiff, Victory Records, Inc. respectfully requests that the Court deny

Defendant Kalnoky's motion to dismiss under Rule 12(b)(6) in its entirety or in individual parts,

and request any such further relief that the Court may deem just and proper.

Dated: March 11, 2016

> MELONI & McCAFFREY
> A Professional Corporation
> By: /s/Robert S. Meloni
>     Robert S. Meloni, admitted *pro hac vice*
>     Thomas P. McCaffrey, *pro hac vice* pending
>     Justin E. Ratliff, *pro hac vice* pending
> 3 Columbus Circle, 15th Floor
> New York, New York 10019
>
> LEVENFELD PEARLSTEIN, LLC
> By: /s/ Christopher M Heintskill (ARDC No. 6272391)
> 2 North LaSalle, 13th Floor
> Chicago, IL 60602
>
> *Attorneys for Plaintiff Victory Records, Inc.*

---

[12] Finally, as a general rule, in those cases where a court grants a motion to dismiss under 12(b)(6), it should give a claimant at least one opportunity to amend. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F. 3d 510, 519 (7th Cir. 2015). Should the Court grant Defendant Kalnoky's motion it should also provide Victory an opportunity to file an Amended Complaint.

20

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 11, 2016, the foregoing document is being served this day on all counsel of record or pro se parties identified below via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Will Parsons, Esq.
SHACKELFORD, BOWEN, ZUMWALT & HAYES, LLC
47 Music Square East
Nashville, Tennessee 37203
Email: wparsons@shackelfordlaw.net

Dated: March 11, 2016

By: /s/ Christopher M Heintskill

21