# THIS BUSINESS OF MUSIC

## The Definitive Guide to the Music Industry
### 10th edition

M. WILLIAM KRASILOVSKY
AND SIDNEY SHEMEL

CONTRIBUTIONS BY
JOHN M. GROSS
JONATHAN FEINSTEIN

BILLBOARD BOOKS
AN IMPRINT OF WATSON-GUPTILL PUBLICATIONS / NEW YORK

16    THIS BUSINESS OF MUSIC

pany for a period longer than the one in which her commitments to MCA could have been fully performed. This was considered to be five years (an initial period of two years plus three one-year options). MCA unsuccessfully contended that the term could be extended for up to seven years by reason of contractual language permitting suspension until the delivery of recordings was completed. As a consequence, record companies usually define the duration of a recording contract in terms of satisfactory delivery of a stipulated number of albums, not in terms of a stated number of years. (See *MCA Records, Inc. v. Newton-John*, 90 Cal. App. 3d 18 [1979].)

Under section 3423 of the California Civil Code, record companies must pay a guaranteed minimum amount per year in order to obtain an injunction against an artist seeking to leave a label while still under exclusive contract. It is important to note that this California statute relates to obtaining a court order barring recording for another company, but does not affect the continuing right to sue for monetary damages should any recording so forbidden be made. The minimum guaranteed payments (subject to further conditions based on actual payments) are as follows:

Year 1: $9,000

Year 2: $12,000

Years 3–7: $15,000

In a 1984 dispute between Motown Records and R&B singer Teena Marie, a California appeals court held that these payments must be truly guaranteed—not dependent on an option exercised at the label's discretion. Further, recording budgets and tour support payments are not part of the guaranteed minimum amount.

These guaranteed payments must be fixed and not merely contingent amounts to be paid under a royalty deal. However, the contingent factor of earned royalties can be used to pay the additional sums required in years 4 and 5 ($15,000) and in years 6 and 7 ($30,000) as long as such sums are actually paid. Any amounts earned in excess of statutory minimums in any particular year can be carried forward as a credit for the next or subsequent years' minimums.

A fail-safe clause in the California law provides that an artist can still be prevented from terminating an agreement, even if it is not in conformity with the requirements of the law, if the record company makes a lump-sum payment to the artist that is 10 times the required minimums. For example, if the first-year guarantee of $9,000 were missing from the agreement, a record company could still make a $90,000 late payment to prevent an artist from terminating by reason of the omission. This is appropriately called the "superstar insurance provision."

## GROUP ARTISTS

A recording contract may cover two or more artists who perform together as a group. In addition to acquiring the exclusive right to the group's recording services, the record company acquires the exclusive right to use the group's name on

records during the term of the agreement. If the group has recorded previously on another label, the contract may include a provision recognizing the right of the first record company to continue using the group name on its recordings.

The time may come when, for various reasons, the group members' paths diverge. When a group member drops out, a satisfactory replacement must be found. This may cause problems between the record company and the remaining group members. The record company may wish to select or approve the replacement so as to ensure the continuation of the group's special sound or quality, but the group may fight for the right to select its own replacement.

The record company may also contend that it is entitled to continue to record the dropout artist as a solo artist, especially if the departing member is a standout performer in the group. The terms of an agreement covering a potential solo artist entail separate negotiations when the group is first signed. The provisions ordinarily run the gamut of those commonly contained in a solo artist agreement, including the initial period of the recording contract, renewal options, royalties, advances, and recording and release commitments.

In some instances, an A&R person may propose that two artists under separate agreements perform together on one or more records. A combined recording made by well-known artists, for example, The Three Tenors, may achieve greater sales than records featuring each artist separately. Record contracts anticipate the division of royalties in such cases by providing for the apportionment of the royalties and the recording costs.

Sony BMG-owned Epic Records and Universal's Interscope forged an unusual pact in relation to the "supergroup" Audioslave, made up of members of Soundgarden (signed to Interscope) and Rage Against the Machine (signed to Epic.) The two major labels, each unwilling to cede its exclusive rights to the work of the band members, agreed to split all costs and profits from Audioslave albums 50–50. They also agreed on a rotating schedule of marketing and distribution duties; Epic promoted the band's 2002 debut, while Interscope handled its 2005 album *Out of Exile*.

## EXCLUSIVITY

Record companies customarily acquire the exclusive right to record an artist during the term of the recording agreement, although there are exceptions in classical music and jazz. Without exclusivity, different companies could issue competing versions of an artist's recordings, with resultant confusion. Furthermore, a record company would be unwilling to spend the time and money required to develop and promote an artist if the artist were also recording for other labels at the same time.

Many performers make a livelihood performing as *sidemen*. They are not the featured performers on recordings, and they are not prominently highlighted on the album cover, packaging, or advertising. Most exclusive recording artist contracts cover any and all recording services except where specifically waived. Accordingly, it is desirable to specify the terms and conditions under which sideman services can be performed for other record companies. Typical