## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

| | | |
|---|---|---|
| VICTORY RECORDS, INC., | ) | **Civil Action No. 1:15-CV-09180** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| TOMAS KALNOKY, individually and | ) | |
| doing business as STREETLIGHT MANIFESTO | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF ROBERT S. MELONI

ROBERT S. MELONI declares under penalty of perjury as follows:

1.    I am a member of Meloni & McCaffrey, a Professional Corporation, co-counsel with Levenfeld Pearlstein, LLC, for Plaintiff Victory Records, Inc. ("Plaintiff" or "Victory").  I submit this Declaration in support of Plaintiff's Motion for Leave to Amend its Answer to Counterclaims pursuant to Fed. R. Civ. P. 15 (a).

2.    Attached hereto as Exhibit A is a true and correct copy of relevant excerpts of the agreement between Victory Records and Streetlight Manifesto dated December 4, 2002.

3.    Attached hereto as Exhibit B is a copy of relevant excerpts of the agreement between Victory Records and Catch 22 dated December 26, 1997.

Dated:  February 9, 2017

_____
Robert S. Meloni

EXHIBIT A

EXCLUSIVE RECORDING AGREEMENT

Agreement made and entered into as of December 4 2002, by and between Victory Records, Inc., 346 Justine Street, Suite 504, Chicago, IL 60607 ("Company") and sure: **Streetlight Manifesto** 12 Wright Ct., East Brunswick, NJ 08816 ("You").

1.      EXCLUSIVE SERVICES.

Company hereby engages your exclusive personal services as a recording artist in connection with the production of Records and you hereby accept such engagement and agree to exclusively render such services for Company in the Territory during the Term and all extensions and renewals thereof. (You are sometimes called "Artist" below; all references in this agreement to you and the Artist and the like shall be understood to refer to you alone.)

2.      TERM.

(a)      The term of this agreement (the "Term") shall commence on the date hereof and continue for an initial period (the "First Contract Period") ending on the date that is eighteen (18) months after Delivery to Company of the Recording Commitment (as hereinafter defined) for the First Contract Period. Artist grants to Company three (3) separate, consecutive and irrevocable options, each to extend the Term for further periods ("Option Periods") consecutively commencing upon the expiration of the preceding period and expiring twelve (12) months after the date Artist delivers to Company the last Album constituting Artist's Recording Commitment in that Option Period. During each Contract Period (as defined below), Artist shall record and deliver to Company a sufficient number of Masters to constitute one (1) new, studio Album. The Albums required to be recorded and delivered under this agreement are sometimes referred to as the "Recording Commitment". As used herein, the term Contract Period shall mean the First Contract Period or any Option Period of the Term, as such may be suspended or extended as provided herein. Each option shall be exercised, if at all, by notice to you at any time prior to the date the current Contract Period would otherwise expire.

(b)      Notwithstanding anything to the contrary contained in paragraph 2(a), if Company has not exercised its option to extend the Term of this agreement for an additional contract period as of the date the then-current contract period would otherwise expire, the following will apply: (i) you will notify Company (the "Option Warning") that the applicable option has not yet been exercised; (ii) Company will have the right to exercise such option at any time until the date ten (10) business days after Company's receipt of the Option Warning (the "Extension Period"); (iii) the then-current contract period will continue in effect until either the end of the Extension Period, or Company's written notice to you ("Termination Notice") that it does not wish to exercise such option, whichever is sooner, and (iv) for the avoidance of doubt, nothing herein will limit Company's right to send a Termination Notice to you at any time, nor limit Company's right to exercise an option at any time if you fail to send Company an Option Warning in accordance with paragraph 2(b)(i) above.

3.      RECORDING COMMITMENT; DELIVERY.

(a)      During each Contract Period you shall cause Artist to record and Deliver to Company sufficient Masters to constitute the Record specified in the following schedule (the "Recording Commitment"):

| Contract Period | Recording Commitment |
|---|---|
| First | One (1) Album (the "First Album") |

VictoryRecordingAgmt/PK/12/9/02                    1

(m)     As to a Record not consisting entirely of Recordings delivered hereunder, the royalty to be paid hereunder shall be prorated in the proportion the Masters (or Video Masters, as applicable) that are embodied on the Record bear to the total number of royalty-bearing master recordings (or Video Masters, as applicable) embodied on that Record.

9.     ACCOUNTING.

(a)     Statements as to royalties payable hereunder shall be sent by Company to Artist on or before the September 30th and March 31st for the respective semi-annual period ending the preceding June 30th and December 31st, together with payment of accrued royalties due to Artist, if any, on sales and licenses for which Company has received payment by the end of the semi-annual accounting period involved.  No statements need be rendered by Company for any such accounting period after the expiration of the Term for which there are no sales or other exploitations of Records derived from Masters hereunder.  Company may withhold from Artist's royalty account a reasonable reserve against anticipated returns, rebates and credits.  As initially established, such reserves shall not exceed twenty-five percent (25%) of Albums shipped during the applicable accounting period.  Should returns exceed twenty-five percent (25%) such reserve shall be raised accordingly.  With respect to sales of singles and other Record configurations, such reserves shall be held in accordance with Company's reasonable business judgment. Company will liquidate such reserves as follows: 50% of each reserve four (4) quarterly accounting periods after such reserve is established and 50% of each such reserve eight (8) quarterly accounting periods after such reserve is established. Company shall have the right to establish reserves in excess of such limitations if in Company's good faith business judgement, Company believes that the percent limitations provided herein may be insufficient to cover actual returns.

(b)     Artist shall be deemed to have consented to all royalty statements rendered by Company to Artist, and they shall not be subject to any objection by Artist for any reason, unless specific objection in writing, stating the basis thereof, is given by Artist to Company within one (1) year from the date the statement is rendered to Artist (the "Objection Period").  Any action, suit or proceeding relating to any royalty statement rendered hereunder must be commenced by Artist within one (1) year after expiration of the Objection Period for that statement.

(c)     Company shall maintain books of account concerning the sale, distribution and exploitation of Records and Masters made hereunder.  A certified public accountant on Artist's behalf may, at Artist's expense, once per calendar year, may examine Company's books as same pertain to the sale, distribution and other exploitation of Records hereunder, at Company's office, during usual business hours and upon no less than thirty (30) days prior written notice and not between November 1 and February 28 of any year. Artist shall propose to Company, in writing and accompanied by appropriate documentation, adjustments to such payments, whether positive or negative, which Artist in good faith believes to be necessary, no later than thirty (30) days after completion of the auditor's field work..  Company's books relating to activities during any accounting period may only be examined as aforesaid during the one (1) year Objection Period.

(d)     Royalties hereunder for sales and licenses derived from sources outside the United States shall be computed in the national currency in which Company is paid therefore, shall be credited to Artist's royalty account hereunder at the same rate of exchange as Company is paid or credited, and shall be proportionately subject to any foreign income, withholding, added value, transfer or comparable taxes which may be imposed upon Company's royalties for those sales and licenses.  If Company cannot collect payment in the United States in U.S. Dollars, Company shall not be required to account to you for the sale, except as provided in the next sentence.  Company shall, at your request and at your expense, deduct from the monies so blocked, and deposit in a foreign depository, the equivalent in local currency of the royalties which would be payable to you on the foreign sales concerned, to the extent such monies are available for that purpose, and only to the extent to which your royalty account is then in a fully recouped position.  All such deposits shall constitute royalty payments to you for accounting purposes.  To the extent possible, Company will

EXHIBIT B



VICTORY RECORDS
1837 W. Fulton Street, Chicago, IL. 60612
(312) 666-8661 / www.victoryrecords.com

Agreement dated 26, December 1997 between Victory Records, 1837 W. Fulton Street, Chicago, IL 60612 ("Company") and CATCH 22 (hereinafter collectively called "Artist") c/o Tomas Kalnoky 12 Wright Ct., E. Brunswick, NJ 08816.

1.  Terms and Options
This Agreement shall commence XXXXXXX and shall continue in force for a term which shall consist of an initial period of one year from such date, and the additional period or periods, if any, by which such term may be extended through Company's exercise of one or more of the options granted to Company herein (see 25). If Artist does not or is not ready to fulfill one of the options within specified term, the term will be understood as in continuation until option is fulfilled but in no event shall the option period exceed two years. It is understood that this Agreement is for four full length recordings with three renewal options by the Company. This understanding transcends the yearly constraints represented in each renewal period. Artist agrees to not unreasonably withhold it's duties in fulfilling it's renewed options with Company to the best of it's ability. A detailed statement as to why delays may occur with recording, artwork etc. need to be delivered to Company by mail or fax at the earliest possible time.

2. RECORDING SERVICES
During the term of this Agreement, Artist will render services at recording sessions at times to be mutually agreed upon, for the purposes of making phonograph records. The musical compositions to be recorded shall be designated by Artist for approval by Company, and each master recording made hereunder shall be subject to the Company's approval as satisfactory for the manufacture and sale of phonograph records.

3. PRODUCT COMMITMENTS
During the initial period of the term hereof [25 (A) First Optional Year], Artist will perform for the recording of one satisfactory full length (at least 26 minutes of music) LP in the single of the demos previously provided to Company, and Company will record Artist's performances. Additional master recordings shall be performed by Artist and recorded by Company at Company's election. Company shall release and distribute phonograph records within 6 months of the completion of each full-length master recording or this agreement shall terminate and Artist shall have no further obligation to Company. Artist's first release for Company will be released within three months of Company receiving all necessary materials to manufacture the release or this Agreement shall terminate and Artist shall have no further obligation to Company.

4. APPROVALS
As to all matters contained in this Agreement to be determined by mutual agreement between Artist and Company or as to which Artist's or Company's approval or consent is required, neither Artist nor Company shall unreasonably withhold such agreement, approval or consent.

(1)

13.2 Miscellaneous
50% of the following costs shall be recoupable from Artist royalties; and will not be incurred without Artist's expressed approval and will not be deducted from costs not directly attributable to Artist:
(a) Costs related to the design and layout of Artist's recordings when not done "in house".
(b) Extracurricular types of promotion through outside agencies.
(c)Extracurricular retail programs including but not limited to listening stations, retail/radio/print specific giveaway samplers not manufactured by Company [as Company manufactures such samplers at no cost to the Artist], co-op ads in conjunction with tours etc.

14. ACCOUNTING AND PAYMENT
(A) Company will compute royalties payable to Artist hereunder, within sixty days after March 31, June 30, September 30 and after December 31 of each year during which records made hereunder are sold, for the preceding three month period, and will render accountings for and pay such royalties, less any unrecouped advances under this or any other agreement between Company and Artist, within such sixty days, except as provided in Paragraph 13.2 hereof. All royalty statements, and all other accounts rendered by Company to Artist hereunder shall be binding upon Artist and not subject to any objection by Artist for any reason unless specific objection in writing, stating the basis thereof, is given to Company within two years from the date rendered. In such case, Artist and/or its assignees will have the right to audit Record Company's financial records within two years after the objection upon written request by certified mail to the Record Company's address as given. Record Company will honor the request for an audit within 60 days.

(B) Company shall have the right to establish reasonable royalty reserves against anticipated returns and exchanges. The reserve so established shall not exceed twenty-five percent (25%) of all phonograph records shipped during each accounting period commencing with the first full accounting period after the release of the respective Record, and twenty-five percent (25%) of all LP Records shipped during each accounting period thereafter. Each reserve shall be fully liquidated equally over the four (4) full accounting periods after such reserve is established. Company shall have the right to establish reserves in excess of such limitations if Company can provide proof that returns will exceed the 25% threshhold. Company must provide Artist documenation proving the need for such an increase in the return reserve. If Company feels that the return liability is less than the aforementioned limitation Company will decrease the reserve accordingly.

15. NAME AND LIKENESS
Company shall have the right to use and allow others to use the name and likeness of Artist and each member of Artist and biographical material concerning any or all of them, for advertising purposes of trade, and otherwise without restriction, in connection with the phonograph records made pursuant to this Agreement and in advertisements for Company, it's artists and products. Company shall not use or authorize any direct endorsement by Artist of any record or performance without Artist's prior written consent. During the term of this Agreement, Artist shall not endorse or authorize Artist's name or likeness to be used in connection with the advertising or sale of phonograph records.